Funkhouser Industries, Inc. (Transferee of assets of The Blakeley Corporation, Transferee of assets of Laing, Harrar & Chamberlin, Inc.) v. Commissioner.
Funkhouser Industries, Inc. v. Commissioner
Docket No. 59330.
United States Tax Court
T.C. Memo 1957-197; 1957 Tax Ct. Memo LEXIS 56; 16 T.C.M. (CCH) 890; T.C.M. (RIA) 57197; October 17, 1957
John S. McDaniel, Jr., Esq., for the petitioner. John W. Dowdle, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income taxes of the transferor taxpayer and liabilities of petitioner as transferee as follows: March 28, 1948, to December 31, 1948
$ 928.31
January 1, 1949, to November 30, 1949
2,166.93
Total
$3,095.24
The issues for consideration are: (1) Whether the respondent erred in disallowing additions to the reserve for bad debts of Laing, Harrar & Chamberlin, Inc., in the amounts of $3,620.98 for the year 1948 and $1,420.94 for the year 1949 under the provisions of section 23(k) of the Internal Revenue Code of 1939; (2) whether the amounts of $1,800 for the year 1948 and *57 $800 for the year 1949 paid by Laing, Harrar & Chamberlin, Inc., to The Blakeley Corporation were incurred for services actually rendered by the Blakeley Corporation, or were ordinary and necessary business expenses of Laing, Harrar & Chamberlin, Inc., within the purview of section 23(a); (3) whether the amount of $4,250 paid in 1949 by Laing, Harrar & Chamberlin, Inc., to Justin Funkhouser Advertising Agency was incurred for services actually rendered by Justin Funkhouser Advertising Agency, or was an ordinary and necessary business expense of Laing, Harrar & Chamberlin, Inc., within the purview of section 23(a); and (4) whether the amount of $1,950 paid in 1949 by Laing, Harrar & Chamberlin, Inc., to The Blakeley Corporation was properly deductible by the taxpayer within the purview of section 23(a). The determination of an additional issue in regard to a net operating loss for the year 1948 will depend on our holdings as to issues 1 and 2. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Funkhouser Industries, Inc., is a Maryland corporation with its principal office at Centreville, Maryland, and for the taxable periods March 28, 1948, to *58 December 31, 1948, and January 1, 1949, to November 30, 1949, is liable as transferee of Laing, Harrar & Chamberlin, Inc., hereinafter referred to as the taxpayer, for any taxes up to the aggregate amount of $3,095.24 as set forth in the statutory notice of deficiency which may be determined by the Tax Court to be due from the taxpayer, plus statutory interest thereon. The taxpayer timely filed its corporate income tax returns for the taxable periods with the collector of internal revenue for the first district of Pennsylvania. The taxpayer was incorporated by The Blakeley Corporation as the sole stockholder thereof on March 29, 1948, and on March 31, 1948, purchased from the O'Sullivan Rubber Corporation the merchandise inventories, real estate, furniture, and fixtures of the latter's Laing, Harrar & Chamberlin division which, to the time of such sale, had been engaged in the business of supplying to wholesale dealers shoe findings, that is, materials, other than rubber heels and soles, used for the repair of shoes. During the years 1936 to 1947, inclusive, the gross sales, bad debts, and percentages of bad debts to gross sales of the Laing, Harrar & Chamberlin business as conducted *59 by O'Sullivan Rubber Corporation were as follows: Year
Gross Sales
Bad Debts
Percentage
1936
$ 953,520
$ 5,000
53
1937
946,402
12,164
1.29
1938
903,026
8,539
.94
1939
900,997
3,761
.42
1940
844,177
8,401
1.00
1941
963,176
19,777
2.05
1942
1,005,252
3,716
.37
1943
1,136,477
1,443
.13
1944
1,211,029
1,123
.09
1945
1,025,006
[1] (860)
[1] (.08)
1946
1,406,360
873
.06
1947
1,068,727
1,640
.15
At the time of its acquisition by the taxpayer the Laing, Harrar & Chamberlin division of O'Sullivan Rubber Corporation had a bad debt reserve in the amount of $5,334, against which the amount of $3,545 was subsequently charged, leaving a balance in the reserve of $1,789. In establishing its method of accounting for the purpose of reporting income for Federal tax purposes, the taxpayer chose to use the reserve method for reporting bad debt losses and based the amount of the annual additions to the reserve upon monthly additions computed at one-half of 1 per cent of total monthly sales. At the end of the taxpayer's first taxable year, December 31, 1948, the monthly additions to the reserve for *60 bad debts totaled $3,698.09, of which amount $3,620.98 was claimed as a deduction on the taxpayer's Federal income tax return filed for that year. During this taxable period the taxpayer sustained no bad debt losses, and the only reduction of the reserve was in the net amount of $77.11 attributable to the reserve established for cash discount. No debts were charged off by the taxpayer, with regard to which efforts to collect were still being made. The taxpayer ceased making sales in April 1949, but liquidation did not take place until November 30, 1949. For the 4 months of 1949 during which the taxpayer made sales, monthly additions computed in the same manner as in 1948 were made to the reserve for bad debts, resulting in a total addition to such reserve of $1,675.21, which amount was claimed as a deduction on the taxpayer's 1949 income tax return. Of such amount, the respondent disallowed $1,420.94. No bad debt losses were actually sustained during this 4-month period of operation, but bad debt losses in the total amount of $254.27 were charged against the reserve within the 31-day period just preceding dissolution of the taxpayer on November 30, 1949. Both before and after *61 November 30, 1949, accounts receivable aggregating $2,674.75 were filed with an agency for collection. When the taxpayer was finally wound up and liquidated, it had accounts receivable of approximately $7,000 dating back to the periods in which the taxpayer was actively engaged in business. Subsequent to November 30, 1949, accounts aggregating $728.49 were charged off as worthless by the transferees. At the end of the 13-month period that the taxpayer was in operation and prior to the charges above set forth, the balance of its bad debt reserve was $5,296.19. The taxpayer had a credit insurance policy which required the taxpayer to bear losses up to one-fifth of 1 per cent of its sales, or $10,000, whichever was larger. The taxpayer established its bad debt reserve by adding onehalf of 1 per cent of total sales each month. This was the same amount and the same procedure as was used by the previous owner of the business. The reserve for bad debts was reviewed at the end of each year, and in these reviews there were taken into account a number of factors such as the number of accounts which had been turned over to a credit agency for collection, the age of the accounts, the type of *62 customers that were being sold to, the experience of the previous owner of the business, the requirements of the credit insurance policy, the previous experience of the taxpayer, and the current conditions in the shoe repair business. A reasonable addition to taxpayer's reserve for bad debts in each of the taxable periods is an amount equal to three-tenths of 1 per cent of taxpayer's sales in such period. The taxpayer had a building in Philadelphia which was used both as a warehouse and for office space. All of the executives did not have offices in this building, however, and, in particular, R. J. Funkhouser, a director and the principal administrative officer of the taxpayer, had his office in Ranson, West Virginia, in a building owned by The Blakeley Corporation. This latter building was the executive headquarters of a number of enterprises controlled by R. J. Funkhouser, and approximately 30 employees, mostly clerical and stenographic, were employed there. In this building there were approximately 15 executive offices, 6 smaller offices, an auditorium which would seat about 200 people, a director's room, 2 smaller conference rooms, a lounge, and a kitchen. R. J. Funkhouser *63 actively participated in the operation of the business of the taxpayer. He was interested in the financing and arranged for bank loans; he was interested in sales and designated salesmen's territories; and he kept close track of inventories and expenses and approved specific expenditures. The officers and salesmen of the taxpayer frequently reported to him at Ranson and he would have the taxpayer's financial report analyzed by the employees of The Blakeley Corporation. Customers of the taxpayer were entertained at the Ranson building and meetings of the officers, executives, and salesmen were also held there. During 1948 and the first 4 months of 1949, the taxpayer paid The Blakeley Corporation $1,800 and $800, resp5ctively, at the rate of $200 per month as its allocable part of the expenses incident to the use of the building and personnel at Ranson. No other payments were made during this period for the space used for the taxpayer's business or for the services of the employees of The Blakeley Corporation performed in connection with the taxpayer's business. The payments of $200 per month by the taxpayer to The Blakeley Corporation were stopped on April 4, 1949, when the taxpayer *64 ceased doing business. However, R. J. Funkhouser participated in the winding up of the taxpayer, and office space and other facilities of The Blakeley Corporation were used for that purpose. These $200 monthly payments were not made pursuant to a formal contract, but they were informally directed and authorized by R. J. Funkhouser. The amounts of the monthly payments to The Blakeley Corporation by the various corporations utilizing their facilities were periodically reviewed, and the $200 per month paid by the taxpayer was in payment for the space and services which the taxpayer was using and receiving. The taxpayer employed the Justin Funkhouser Advertising Agency, hereinafter called the agency, to assist it in locating new products to be handled by the taxpayer, both in the same line as that previously handled by the taxpayer and also in new and different lines. The agency had offices in Baltimore, New York, and Ranson, and had previously done work for the taxpayer's predecessor in business. The agency was an affiliate of The Blakeley Corporation and Justin Funkhouser, its president, was the son of R. J. Funkhouser. The principal work of the agency for the taxpayer was to make *65 market surveys and to test markets for products being handled or contemplated being handled. This required the use of field men, and it was necessary for the taxpayer to employ an outside firm such as this agency because its own salesmen only called on wholesalers. The survey work consisted in part of a continuation of work which had previously been done by personnel of the O'Sullivan Rubber Corporation. The agency investigated the possibility of marketing zipper repair materials and used up to 6 men part-time to call on shoe repair men to determine their interest in also handling zipper repairs. Ultimately, the taxpayer's successor went into the business of selling zipper repair materials. The agency also investigated the possibility of the taxpayer selling refrigerated pharmaceutical cabinets and called on approximately 1,000 doctors before finally determining that there was insufficient demand for this product, and endeavored to secure exclusive lines of shoe polish for the taxpayer. When it was determined to liquidate the taxpayer's business, the survey work of the agency was terminated and a settlement was negotiated for the services which had been performed. The settlement *66 was negotiated by R. J. Funkhouser and Harry Wright, an employee of the agency, and was based on the costs which had been incurred. The taxpayer deducted $4,250 for this expense on its 1949 Federal income tax return. In 1949 the taxpayer took steps to sell the 3-story building used by it in Philadelphia, and considered it necessary to move and store elsewhere its inventory and records. The Blakeley Corporation undertook to move and store the taxpayer's inventory and records and made a charge to the taxpayer on this account of $1,950, which the taxpayer paid and deducted. A part of the merchandise and all of the records were stored in West Virginia by The Blakeley Corporation. Included in the moving expenses to be paid by The Blakeley Corporation was a freight bill of $600 covering the cost of shipping the merchandise and records to West Virgina. This bill was not paid by The Blakeley Corporation but was actually paid by the company which took over and operated the business of the taxpayer after the latter's dissolution. The records stored by The Blakeley Corporation on behalf of the taxpayer were used in connection with the winding up of the taxpayer's business, and this deduction *67 of $1,950 also was intended to cover expenses involved in the collection of accounts receivable still held by the taxpayer. The work in connection with using these records and making collections was performed by employees of The Blakeley Corporation. The payment made by the taxpayer to The Blakeley Corporation in 1949 in the amount of $1,950 was properly deductible by the taxpayer in that year. Opinion KERN, Judge: The issues involved in this case are: (1) Whether additions to the reserve for bad debts of the taxpayer in the amounts of $3,620.98 for 1948 and $1,420.94 for 1949 were reasonable additions to the reserve and deductible under section 23(k) of the Internal Revenue Code of 1939; (2) whether the amounts of $1,800 for 1948 and $800 for 1949 paid by the taxpayer to The Blakeley Corporation were deductible under section 23(a) as payments for office space and other facilities and services furnished to it; (3) whether the amount of $4,250 paid by the taxpayer in 1949 to Justin Funkhouser Advertising Agency was deductible under section 23(a) for services actually rendered to it; (4) whether the amount of $1,950 paid in 1949 by the taxpayer to The Blakeley Corporation *68 was deductible under section 23(a) as a part of the cost of goods sold or for services rendered to it by The Blakeley Corporation; and (5) whether the taxpayer sustained a net operating loss for the taxable year 1948 which was deductible as a net operating loss carry-over in computing net income for the taxable period ended November 30, 1949. We will discuss each of the first four issues separately. The disposition of the final issue as to the net operating loss will depend on our determination of the first and second issues, and therefore may properly be settled under a Rule 50 computation. The respondent determined that the additions to the taxpayer's bad debt reserve in the taxable periods of 1948 and 1949 were excessive and unreasonable, and therefore disallowed the claimed deduction of these additions under section 23(k). The taxpayer contends that this action on the part of the respondent was "wholly arbitrary, and that on the basis of the facts as they were known at the close of each taxable period the amounts which the Taxpayer added to the reserve were reasonable and consequently should be allowed as deductions in computing the Taxpayer's net income for those periods. *69 " There is no question that the burden of proof to show the reasonableness of the claimed deduction for the additions to the reserve for bad debts is on the taxpayer. Fibre Yarn Co., 10 B.T.A. 479; Imperial Type Metal Co. v. Commissioner, 106 Fed. (2d) 302; Apex Brewing Co., 40 B.T.A. 1110; Southeastern Finance Co., 4 T.C. 1069, affd. 153 Fed. (2d) 205. And, further, the respondent's determination must be allowed to stand, unless it can be shown that the disallowance of the deduction amounts to an abuse of discretion. Walter H. Goodrich & Co., 40 B.T.A. 960, dismissed (C.A. 2); Krim-Ko Corporation, 16 T.C. 31, 37. That is the precise question here. As was stated in C. P. Ford & Co., Inc., 28 B.T.A. 156, 158-159: "A taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless and charged off, but if instead he chooses to deduct additions *70 to a reserve, the subjects himself to the reasonable discretion of the Commissioner. Reserves of any sort are not ordinarily deductible, Spring Canyon Coal Co. v. Commissioner, 43 Fed. (2d) 78, and when Congress so far departs from the customary practice as to permit such a deduction as to a bad debt reserve, the condition is as important as the permission. Such a deduction presents substantial problems of administration, and it can not be assumed that Congress intended either that the taxpayer's unrestrained judgment as to the propriety or wisdom of his method or that the Board's judgment in a particular case when not supported by broad administrative considerations as well as the taxpayer's individual premises should override the Commissioner's sound discretion. * * *" The respondent's determination for each year must be judged on the particular facts for that period, and an allowance by the Commissioner for a prior year does not bind him to approve the same allowance of an addition to the reserve for bad debts for a later year. Art Metal Construction Co. v. United States, 17 Fed. Supp. 854. *71 What constitutes a reasonable addition to a reserve for bad debts depends upon the facts and circumstances of the business engaged in with relation to the general business conditions at the time the addition is claimed. In the instant case the taxpayer based the additions to the bad debt reserve upon monthly additions computed at one-half of 1 per cent of monthly sales. Usually such additions to a bad debt reserve are based upon a percentage of the accounts and notes receivable. Erie Dyeing & Processing Co., 12 B.T.A. 393. However, we have before approved additions based upon a percentage of gross sales. Shield Co., 2 T.C. 763; Proctor Shop, Inc., 30 B.T.A. 721, affirmed without discussion on this point 82 Fed. (2d) 792. To show that the amounts which were added to the reserve for bad debts were reasonable, the taxpayer has introduced evidence that its predecessor used the same method and percentage figure for establishing additions to the reserve for the years prior to the acquisition of the business by the taxpayer. Such evidence *72 included the experience of the years 1936 through 1947, inclusive, and encompassed years of both prosperity and recession. The taxpayer argues that, based on the actual experience of its predecessor, these additions to the bad debt reserve were reasonable. However, the respondent points out that in no one of the previous 5 years did bad debt losses actually sustained by the predecessor exceed one-fifth of 1 per cent, and yet the taxpayer's additions were computed at the rate of one-half of 1 per cent. We have stated that prior years are not necessarily a guide, so the respondent cannot wholly rely on this experience either, especially in view of the fact that the shoe repair business was falling off in prosperity following the profitable wartime years. The total amount of additions claimed by the taxpayer for the 13 months it was in operation exceeded the amount of actual bad debt loss sustained by its predecessor over the 5-year period immediately preceding the taxpayer's acquisition of the business by $1,154.30. Certainly, if past experience is any criterion, the taxpayer has failed to show that all of the additions to its bad debt reserve were reasonable and necessary. During the *73 4 months of operation in 1949 no bad debt losses were charged off, but bad debt losses of $254.27 were later charged off against the reserve within the 31-day period preceding the dissolution of the taxpayer on November 30, 1949. During the 9-month period in 1948, the additions to the reserve for bad debts totaled $3,698.09, of which amount $3,620.98 was claimed as a deduction for that year. For 1949 the amount of $1,675.21 was claimed as a deduction for additions to the reserve. The respondent has stated in his brief that the experience of the taxpayer's predecessor for the 5-year period just prior to the taxpayer's acquisition of the business indicated that additions to a bad debt reserve for that period reasonably would not have exceeded one-fifth of 1 per cent. However, respondent's determination herein in reality disallows any reserve for bad debts. We realize that the burden is upon the taxpayer to show that the respondent's disallowance of the additions to the reserve was arbitrary and without support from the facts. We conclude on the record as a whole that the taxpayer is entitled to some deductions for additions to a bad debt reserve for the taxable periods involved, and *74 this is a proper situation for the application of the so-called Cohan rule. Cohan v. Commissioner, 39 Fed. (2d) 540. In applying this principle to achieve approximate justice, we have taken into consideration that the taxable periods showed, through decreased sales, that there was a depression of the shoe repair industry, and have concluded that a reasonable addition to the bad debt reserve for each of the taxable periods would have been three-tenths of 1 per cent of total sales. The second question for decision is whether the amounts of $1,800 for the year 1948 and $800 for the year 1949 paid by Laing, Harrar & Chamberlin, Inc., to The Blakeley Corporation were incurred for either services rendered by The Blakeley Corporation or were ordinary and necessary business expenses within the purview of section 23(a). The respondent, in his notice of deficiency, disallowed the entire amount of these payments "because there is no evidence that the services were actually rendered or that they were ordinary and necessary business expenses." A careful consideration of the record indicates that the pertinent facts are as follows: R. J. Funkhouser, the principal stockholder and *75 administrative officer of the taxpayer, had offices in a building in Ranson, West Virginia, owned and staffed by The Blakeley Corporation. He and other officers of the taxpayer made use of Blakeley's employees in the performance of their duties as executives and employees of the taxpayer. The taxpayer also made frequent use of space in the Blakeley building. While the taxpayer's business was being wound up, all work in connection with the books and records was done by the employees of The Blakeley Corporation. The respondent's position is that there is no evidence other than opinion testimony available to show the reasonableness of these deductions and also that there was never any formal agreement covering the payment for the services and expenses involved. The record is unsatisfactory insofar as any specific evidence regarding these deductions is concerned, but, nevertheless, we are convinced that the several business expenses were incurred. Admittedly, the exact amount of these expenses under the circumstances was difficult of ascertainment. The taxpayer was but one of numerous corporations controlled by Funkhouser. Most of these enterprises were necessarily involved in either *76 the operating expense or the use of space in the building owned by The Blakeley Corporation in which Funkhouser maintained his several offices. The expenses claimed are all of an overhead nature, and it seems to us that the taxpayer is entitled to the claimed expense deductions. Another question for decision is whether the amount of $4,250 paid by Laing, Harrar & Chamberlin, Inc., to the agency in 1949 constituted an ordinary and necessary business expense for services rendered. The respondent again takes the position that the taxpayer has failed to sustain the burden of proof of introducing sufficient evidence to show that it is entitled to this deduction as an ordinary and necessary business expense. The respondent also points out that the agency was another of the several enterprises controlled by R. J. Funkhouser. The taxpayer claims, and we have so found, that certain services were performed by the agency for the taxpayer in 1949 in connection with a survey to find new products and new markets. The agency employed as many as 6 men on a parttime basis to investigate the possibility of adding zipper repair materials to the taxpayer's business and also to call on about 1.000 doctors *77 in regard to a refrigerated pharmaceutical cabinet. Further proof of the services performed by the agency is seen by the fact that the zipper repair products line was adopted by the taxpayer's successor. When the decision to liquidate the taxpayer was made, the agency was told to discontinue its survey project. At that time an agreement was reached concerning the cost of the work already done based on a review of the agency's records. The amount agreed upon was in addition to the $155.50 charged by the taxpayer on his return to advertising expenses for the normal advertising of its products by the agency. We conclude that the taxpayer is entitled to this deduction in the amount claimed. The final issue for determination concerns the respondent's disallowance of $1,950 claimed as a deduction by the taxpayer in 1949, and representing a charge made to it by The Blakeley Corporation on account of freight charges, warehouse storage of books, records, and merchandise, and some liquidation expenses defrayed and furnished by The Blakeley Corporation for the taxpayer's benefit. In our opinion the record herein substantiates this deduction. It is true that by some mistake a freight bill of *78 $600 was paid, not by The Blakeley Corporation but by one of its affiliates. However, it was not paid by the taxpayer (except by its payment here in question to The Blakeley Corporation). The Blakeley Corporation undertook that this expense would be paid on behalf of the taxpayer, and it was paid. The remaining issue concerning the taxpayer's net operating loss for the taxable year 1948 may be computed under Rule 50 on the basis of our holdings on the other issues. Decision will be entered under Rule 50. Footnotes
1. Denotes net recovery.↩