APEX BREWING CO. INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 91977.   Promulgated December 15, 1939.

*H. B. Jones, Esq.*, and *George C. Kinnear, Esq.*, for the petitioner.
*Edward C. Adams, Esq.*, for the respondent.

1112

OPINION.

KERN: 1. Our first question is whether there was any gain realized by petitioner on the transfer to it of the brewery and other assets. The respondent contends that petitioner realized a profit of $28,333.50 on the deal. This results, he argues, from a sale price of $72,063.45, from which is to be deducted the $1,000 cash paid at the sale plus the mortgage of $21,063.45 assumed by petitioner, leaving $50,000 as the sale price of the 2,500 shares of Hemrich Investment Co. stock. This sum of $50,000, less the cost base of the stock in the hands of individual

shareholders of the Hemrich Investment Co. who became incorporators of petitioner, results, according to respondent's determination, in a profit to petitioner of $28,333.50.

The principal difficulty in determining this issue is the interpretation of the facts and the ascertainment of their legal significance. Respondent contends that, in effect, the individual incorporators transferred their Hemrich Investment stock to petitioner corporation in return for all of its stock then issued, and that, thereafter, the petitioner exchanged the Investment stock with the Hemrich Brewing Co. in part payment for the latter's physical assets. The conclusion which respondent urges is that the transfer of the Investment stock to petitioner by its incorporators is nontaxable by virtue of section 112 (b) (5), that the basis of such stock to petitioner was thereupon the same as it was to the incorporators by virtue of section 113 (a) (7), and that, therefore, the exchange of such stock by petitioner for the physical assets of the Hemrich Brewing Co. having a value in excess of such basis would result in taxable income to petitioner in the amount of such excess.

Petitioner's contention is in effect that its incorporators had a contract with the Hemrich Brewing Co. whereby they had the right to obtain the physical assets of the Brewing Co. for $72,063.45 and to satisfy $50,000 of this amount by transferring to the Brewing Co. 2,500 shares of Investment Co. stock which they then owned; that these incorporators thereupon approached petitioner corporation which they had had formed and proposed the assignment of this contract to petitioner after it had been partially executed by the incorporators, i. e., after they had transferred the Investment stock to the Brewing Co., and that petitioner's stock was issued to them in consideration for the assignment of this partially executed contract. Therefore, petitioner contends, the question of the basis of the Investment Co. stock is not pertinent, and the basis of petitioner's assets would be the fair market value of those assets when received in exchange for its stock.

The difficulty with respondent's contention is that the incorporators of petitioner did not transfer their Investment Co. stock to petitioner in return for petitioner's stock and petitioner did not exchange the Investment Co. stock for the physical assets of the Brewing Co. The transfer of the Investment Co. stock was made by the incorporators to the Brewing Co. and nothing in the record indicates that petitioner ever had title of any kind to this stock. Nor does it appear that there were two separate transactions, as respondent contends—a transfer of Investment Co. stock to petitioner and an exchange of this stock by petitioner to the Brewing Co. Rather, it appears that the transactions between the petitioner, its incorporators, and the Brewing Co. were simultaneous and legally interdependent.

The difficulty with petitioner's contention is that the record discloses no contract executed between petitioner's incorporators and the Brewing Co., and no assignment of any such contract partially executed to the petitioner. While the minutes of the petitioner's board of directors, set out in our findings, mention a contract with the Brewing Co. to be executed by petitioner's incorporators on its behalf, and the assignment of such contract to petitioner, the only contract introduced in evidence was the contract to which petitioner itself was a party, named together with the individual incorporators as "purchasers."

We are disposed to treat the facts in the following manner: Petitioner's incorporators and their associates made an oral deal with the Brewing Co. prior to petitioner's incorporation, whereby it was understood that the incorporators could purchase the assets of the Brewing Co. on the terms and at the figure set out in the contract later executed, to which we have referred, including the privilege of transferring to the Brewing Co. 2,500 shares of Investment Co. stock in lieu of a payment of $50,000 on the initial cash payment. After this deal or understanding petitioner corporation was formed, not for the purpose of acquiring the Investment Co. stock held by its incorporators, but for the purpose of acquiring and operating the assets of the Brewing Co. The entire plan had been fully formulated by the incorporators in the beginning, but it was now necessary that petitioner should take formal corporate action. Petitioner, therefore, by appropriate resolution determined that the purchase of these assets at the price and on the terms previously understood between the incorporators and the Brewing Co. was advantageous, and the incorporators thus formally agreed that they would transfer their Investment Co. stock to the Brewing Co. in lieu of the cash payment of $50,000. Immediately a written contract was executed between the Brewing Co. as "seller" and petitioner and the individual incorporators as "purchasers", which recited the receipt of such stock by the "seller." As a result of these transactions, petitioner acquired its assets from the Brewing Co., the Brewing Co. acquired the Investment Co. stock from petitioner's incorporators, and the latter acquired petitioner's stock.

The result of this single triangular transaction was the same as would have been the result if the petitioner's incorporators had acquired the assets of the Brewing Co. in exchange for the Investment Co. stock and had then, in a later transaction, transferred these assets to the petitioner in return for its stock. In such a case the basis to petitioner's transferors would not be the original basis to them of the Investment Co. stock, but would be their basis as to the Brewing Co. assets, which would be greater as a result of this taxable exchange. Petitioner by taking these assets in return for the issuance of its stock

would not realize a gain or receive taxable income. It would result that petitioner's incorporators in such a view of the case realized a gain resulting in taxable income by their exchange of Investment Co. stock for assets of the Brewing Co., but it is they who should be taxed thereon and not petitioner. A consideration which especially persuades us to view the legal effect of the transactions in this way is the fact that petitioner was organized for the purpose of acquiring and operating the assets of the Brewing Co., which consisted of a going brewery and its inventory of beer and manufacturing supplies. It was not formed for the purpose of acquiring or holding the Investment Co. stock and it never did, in fact, acquire or hold that stock. Since the sole object of the plan was to get the brewery into the hands of the new corporation formed to operate it, and since petitioner's stock had no market value apart from the assets which it should acquire, the means of acquisition adopted were immaterial both to the corporation and to its promoters; and the most careful scrutiny of their several acts can reveal nothing of significance unless sight is kept of this controlling fact, which dominates the whole transaction. Both the sequence and significance of those acts must be read in the light of this ultimate object, and in applying this test we do not find that petitioner realized any gain.

We are not persuaded that the relationship between a corporation and its promoters is so close as to necessarily result in considering the corporation as realizing a taxable gain from the disposition of property which it never owned in a transaction which, of necessity, preceded its possession of any property and its transaction of any of the business for which it was formed.

On this issue our decision is in favor of petitioner.

2. We now pass to the second issue, of the proper basis for depreciation of certain of petitioner's physical assets. Both parties have treated the aggregate of petitioner's fixed assets and beer in the process of manufacture as acquired for a total price of $72,063.45. The purchase contract fixed no specific sum for the separate assets transferred and the respondent, therefore, allocated the purchase price to the several assets by apportioning it according to the original cost of those assets to the transferor, the Hemrich Brewing Co., as follows:

|  | Cost | Percentage | Value |
|---|---|---|---|
| Building | $44,581.67 | 30.6648 | $22,098.11 |
| Machinery | 43,743.40 | 30.0882 | 21,682.60 |
| Office equipment | 948.24 | .6522 | 470.00 |
| Cooperage | 8,750.00 | 6.0186 | 4,337.21 |
| Land | 22,063.45 | 15.1760 | 10,936.35 |
| Inventory of beer | 25,297.08 | 17.4002 | 12,539.18 |
| Total | 145,383.84 | 100.0000 | 72,063.45 |

Petitioner complains that its beer in vats and barreled (4,949 barrels) was current inventory, with a readily realizable cash value, and this assertion appears to be sustained on the sales which petitioner made as soon as it took over. If this is so, petitioner continues, the beer's inventory value, cost or market, whichever is lower, can not arbitrarily be written down to the allocated figure such as is here employed, of $25,297.08. Moreover, since inventory "cost" has been found to be $10.12 a barrel on the basis of Hemrich's prior book value and at least $7 as the basis of Hemrich's offer to buy back petitioner's beer for that amount, and since inventory market value on the basis of actual sales has been ascertained to be $6 a barrel, obviously inventory market value is lower than cost and should be employed. This would give an inventory value to the beer of $29,700. The remaining inventory (manufacturing supplies) would have to be included at cost value.

We can see no very valid objection to petitioner's contention. It is true, as respondent argues, that this would mean that the remainder of the purchase price of $72,063.45 would have to be reallocated to the fixed assets, but we can not see that this would raise any particular difficulty, since the same method of allocation as respondent originally employed here can be used again. Nor do we think it material that petitioner has adduced no new evidence of material import in regard to the value of the fixed assets, beyond showing that the brewhouse was obsolescent. If, as we think, the inventory value has been satisfactorily established, the readjustment can be made as to it in fairness to petitioner without the necessity of its establishing also all values of its fixed assets on new evidence; and we so hold.

3. As to the rates of depreciation which should be applied, we are unable to concede the petitioner's contention in full. Petitioner originally took a deduction for annual depreciation of 3½ percent on its building and 10 percent on its cooperage. The evidence shows that the building was frame and was becoming obsolescent for modern steel brewing vats on that account, but we do not think that the evidence on the whole is clear enough to allow us to overturn respondent's determination and to fix, as petitioner contends we should, a useful life of twenty years for the building. We therefore leave that depreciation rate unaltered. Petitioner contends that the evidence shows that the cooperage was so inferior that a useful life of not more than six or seven years should be found, and a deduction allowed accordingly of 15 percent for 1934. As we think the evidence does support this contention, we allow it.

4. We now pass to the last question in issue, which involves petitioner's reserve for bad debts of $10,000, set up at the end of its fiscal year January 31, 1935, of which reserve respondent allowed only $5,000 as a deduction for tax purposes.

In view of the provisions of the statute on this subject (section 23 (k), Revenue Act of 1934), it is necessary for petitioner, in order to prevail on this issue, to show clearly that the respondent acted unreasonably in disallowing as a deduction a part of the bad debt reserve set up by petitioner. Cf. *C. P. Ford & Co.*, 28 B. T. A. 156. See, also, Treasury Regulations 94, article 23 (k)-5, for pertinent provisions on this subject.

The respondent justly points out that when the reserve was set up, January 31, 1935, the petitioner had had gross sales during the ten months of its existence of over $377,000, had outstanding accounts at the time of over $35,000, and going accounts receivable of more than $30,000; so that the claimed deduction represented about one-third of its accounts receivable. He also calls attention to the actual write-off of bad debts by the petitioner at this time, which was only $598.68. And respondent correctly insists on the rule that the later experience of the petitioner in setting up reserves or additions thereto can not be availed of to justify the reasonableness of the reserve in the year in question, which must be determined on the facts then known to him.

When all this is said, however, we are still unpersuaded that the reserve, in the peculiar circumstances of the times in petitioner's trade, was unreasonable or that respondent acted reasonably in disallowing any part thereof. We think that the reserve was proper in the light of the facts known to the petitioner and to his auditors, a reputable firm of certified public accountants, at the time when it was set up. We shall state our reasons for believing so, after looking at the authorities.

In *Rhode Island Hospital Trust Co.* v. *Commissioner*, 29 Fed. (2d) 339, the Court of Appeals for the First Circuit considered a situation in banking not unlike that here presented in the brewing trade. It said, at page 342:

> Very few, if any, banks would, in the fall of 1921, have acted wisely if they had taken the "experience as to losses over a period of years" as then a basis for a reserve for bad debts. Unusual conditions call for unusual measures. The Board of Tax Appeals in effect ruled that the unusual conditions of 1920–21 should be disregarded, and that this bank was entitled to make no increase in its reserve except on the basis of experience as to losses over a period of years. That was plainly error.

To the same effect, sustaining the taxpayer's right to apply a different rule in changed economic conditions, is our decision in *National Mill Supply Co.*, 23 B. T. A. 1363, 1375; affd., 62 Fed. (2d) 420. In the instant case the evidence is clear that petitioner, like other breweries with which its competition was sharp, sought all the "outlets" for retail trade possible. The retailers which had sprung up in abundance after repeal of the Liquor Prohibition Amendment a few months before were in very many cases without financial reserves and obtained credit easily only because of the newness of the trade

and the keenness of the brewers' competition. These facts were fully known to petitioner's officers at the time and to their auditors, when they came to set up the reserve. The evidence also indicates that the state liquor control board discouraged the charge-off of bad debts on beer accounts until it should be able to issue formal rules regulating these matters, which was eventually done on November 1, 1935. This fact explains in part the very small charge-off made by petitioner at the close of its fiscal period in question. Moreover, petitioner's later credit history, although it can not be received in evidence for determining the basic fact before us, does substantiate the reasonableness of the petitioner's determination in that it indicates the business sagacity displayed in setting up a reserve sufficiently large at the time to anticipate the results of its overexpansion of credit. We need not review these facts which we have set out in our findings, but their import can not be properly overlooked. The reserve, with relatively small annual additions, was completely absorbed by charge-offs in the next few years. The evidence shows, moreover, that certain specific accounts still carried as good on the basic date thereafter proved bad and might properly have been considered bad on January 31, 1935. Doubtless but for the loss by fire of many of petitioner's records, this story could have been amplified in detail. We have sufficient evidence, however, to feel convinced that the reserve, in the unusual conditions here present, was in all respects reasonable and that respondent acted unreasonably in disallowing any part of it as a deduction.

It is significant that the ratio of bad debts to total accounts receivable was approximately the same in the case of a neighboring competitor of petitioner as in the case of petitioner for this period, indicating that the credit problem of this period was not peculiar to petitioner, but was widespread and acute enough to be recognized, studied, and provided for. Also, we stress the fact that petitioner created this bad debt reserve in the taxable year, and that the taxable year was immediately after the repeal of the Eighteenth Amendment to the Federal Constitution, so that neither the petitioner nor the industry in which it was engaged had a credit history for prior years which could have been helpful in determining the amount to be set up as a reserve for bad debts. Because of this fact, and the fact that the industry as a whole faced an unusual credit condition, it was necessary for petitioner to make a careful analysis of the available facts, and this the petitioner, in our opinion, did.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

BLACK and MELLOTT dissent on the first point.