ROANOKE VENDING EXCHANGE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 88061. Filed July 17, 1963.

*Charles H. Burton,* for the petitioner.
*Charles C. Shaw, Jr.,* for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in the income tax of petitioner for the taxable years 1956 and 1957 of $4,970.41 and $7,344.26, respectively.

The issue involved herein is whether annual additions to petitioner's bad debt reserve for 1956 and 1957 were unreasonable and excessive.

#### FINDINGS OF FACT

Some of the facts were stipulated. Those so stipulated are found accordingly and incorporated herein by this reference.

Roanoke Vending Exchange, Inc. (sometimes hereinafter referred to as petitioner), was incorporated in 1948 under the laws of the State of Virginia. Its offices and principal place of business during 1956 and 1957, the taxable years here involved, were located in Richmond, Va. The petitioner timely filed income tax returns for the taxable years 1956 and 1957 with the district director of internal revenue at

Richmond, Va. It kept its books and records of account and reported its income for tax purposes under the accrual method of accounting.

Prior to June 26, 1954, Frank Page owned 75 percent of petitioner's outstanding shares of common stock and Jack G. Bess owned the remaining 25 percent. About June 26, 1954, Page died and the Mountain Trust Bank of Roanoke, Va. (hereinafter referred to as the Bank), acquired, along with the other assets of the deceased's estate, his 75-percent stock interest in petitioner as trustee of a testamentary trust established pursuant to Page's will for "deserving high school graduates of Montgomery County, Virginia." The trust has continued in operation during the years in question holding as its principal asset 75 percent of petitioner's stock.

Since June 1954 Jack G. Bess has served as president and general manager of petitioner. John W. Boyle has served as vice president and treasurer of petitioner and at the same time executive vice president and director of the Bank.

From its inception, petitioner has been a wholesale distributor of vending machines including "juke boxes," cigarette machines, "kiddie" games, and other coin-operated amusement and food dispensing machines. It also sold supplies and parts to customers of these machines. Petitioner sold the machines to local operators who purchased for their own account and in turn placed them in suitable locations for their use by the general public. The local operators serviced their machines and collected the money deposited in them.

The petitioner's customers generally had a low credit rating, were not good businessmen, and did not have a great deal of capital. In most instances the machines acquired by petitioner's customers constituted their sole business assets. The operators made their profit from the use of the machines by patrons of establishments which housed the vending machines. Thus, their profits were relative to the use of the machines. In turn, petitioner expected to be paid as the operator collected from the machines. If the vending machines were not used to any extent, the local operators' profits were reduced accordingly and the operator was thus slower in paying off his account with petitioner.

Petitioner took a flexible approach with respect to the terms and conditions of the sales of its machines and was quite lenient in extending credit. Its sales were made on two bases: (1) On open accounts with payment from 30 to 90 days and (2) under conditional sales contracts with notes evidencing the indebtedness. In some instances, the petitioner's customer would buy on open account initially and if payment had not been completed after 90 days had elapsed, petitioner would urge payment; if such was not forthcoming, it

would then have the customer convert the account into a note receivable secured by a chattel mortgage. After such a note had been signed, it appeared on the books as a current note, although it had been, at the outset, an open account which may have been from 1 to 3 months past due. The terms of both notes issued initially upon sale and those issued upon refinancing generally ranged from 1 to 18 months.

Petitioner refinanced and kept current those customer's accounts in which a note had been executed initially by obtaining a new note from the customer. The effect of this was to consolidate and extend the unpaid amounts of the outstanding notes receivable. Petitioner also consolidated and refinanced amounts due from a particular customer where additional machines were purchased. Thus, it consolidated the old debt with the new one and brought the total sum up to current status. In many instances of refinanced delinquent notes, or accounts, the petitioner would add interest to a delinquent note at 6 percent per annum for 30 months, accrue the interest and report such accrual as taxable income at the time of the execution of the note.

One of the reasons for such refinancing of the outstanding debts was the experience of petitioner that where it stopped selling to a customer with an outstanding delinquent balance, the collection of such accounts declined greatly. It also found that rather than foreclosing on a delinquent account, the possibility of payment could be perpetuated by working with the customer to keep him operating or seeking a purchaser to buy out the old customer's equity and assume the debts of that customer. It thus was petitioner's purpose to keep those machines and the customer operating as long as possible and it was quite reluctant to charge off any account. Where it felt that there was no longer any possibility of payment by refinancing, it turned the account over to an attorney for collection. However, petitioner's practice, in general, was not to charge off an account as a bad debt until it had been turned over to an attorney.

The customers generally paid off their notes or open accounts receivable over a long period of time because of their unstable earning pattern. As a result, a greater proportion of petitioner's accounts receivable consisted of notes which generally had a longer duration of payment than the open accounts receivable. Thus, the history of petitioner's business shows a conscious pattern of slow payment by its customers and extended credit for long periods.

The following chart represents a breakdown of petitioner's accounts and notes receivable and its reserve for bad debts for the period 1949 through and including 1960.

| Year | Total accounts receivable—Balance as of Dec. 31—Open accounts and notes | Accounts receivable—Open accounts balance as of Dec. 31 [a] | Accounts receivable—Notes, balance as of Dec. 31 [a] | Combined notes and open accounts receivable past due beyond 90 days [a] | |
|---|---|---|---|---|---|
| | | | | Amount | Percent |
| 1949 | $211,492.22 | | | | |
| 1950 | 315,574.87 | | | | |
| 1951 | 374,592.26 | | | | |
| 1952 | 380,489.04 | | | | |
| 1953 | 472,248.72 | | | | |
| 1954 | 522,083.68 | | | | |
| 1955 | 654,657.44 | | | | |
| 1956 | 723,918.20 | $185,788.61 | $541,026.89 | $158,016.60 | 21.8 |
| 1957 | 859,947.22 | 198,610.81 | 657,566.90 | 112,136.88 | 13.03 |
| 1958 | 722,807.71 | 287,081.48 | 441,891.06 | 153,994.53 | 21.3 |
| 1959 | 741,648.37 | 291,565.03 | 450,083.34 | 133,848.14 | 18.4 |
| 1960 | 473,527.92 | 142,098.78 | 325,920.37 | 144,953.02 | 30.6 |

[a] The record does not indicate the balances for the years prior to 1956.

| Year | Bad debt—Specific charge-off prior to 1954 [b] | Reserve for bad debts—Balance as of Dec. 31 [c] | Reserve for bad debts—worthless accounts written off during each year | Worthless accounts turned over to attorneys for collection prior to write-off [a] |
|---|---|---|---|---|
| 1949 | $4,396.25 | | | |
| 1950 | 8,753.21 | | | |
| 1951 | 4,548.10 | | | |
| 1952 | 10,052.01 | | | |
| 1953 | 5,943.30 | | | |
| 1954 | | | $2,956.73 | |
| 1955 | | | 1,481.29 | |
| 1956 | | $65,465.74 | 2,632.40 | $2,447.48 |
| 1957 | | 62,833.34 | 991.81 | 200.00 |
| 1958 | | 61,841.53 | 9,275.90 | 9,225.33 |
| 1959 | | | 10,553.02 | |
| 1960 | | | 20,370.17 | |

[a] The record does not indicate the balances for the years prior to 1956.
[b] Petitioner was on the "specific charge-off" method of handling its bad debts from its inception through 1953. In 1954, petitioner changed to the reserve method of dealing with its worthless notes and open accounts.
[c] These figures represent petitioner's balances in its reserve for bad debts adjusted for accounts written off due to worthlessness but do not reflect additions claimed in its 1956 and 1957 income tax returns and disallowed by respondent.
The record neither indicates the balances in the reserve account for years prior to 1956 or subsequent to 1957 nor does it indicate additions claimed and/or allowed for years subsequent to 1957.

On December 31, 1956, petitioner had a balance in its "accounts receivable—open accounts" of $185,788.61. Of that balance, $146,113.59 was paid to petitioner without the necessity of a note. Of the $541,026.89 balance in the "accounts receivable—notes" account for that same date, notes having a balance due on that date totaling approximately $228,093.37 were refinanced by petitioner's customers by either executing a new note for the unpaid balances of certain old notes or a new note for the sum of the purchase price of new merchandise and the aggregate amount of the unpaid balance of certain old notes.

Of the $198,610.81 balance in petitioner's "accounts receivable—open account" on December 31, 1957, $80,959.39 of the total balance was paid to petitioner without the necessity of a note. Of the $657,566.90 balance in petitioner's "accounts receivable—notes" account on December 31, 1957, notes having a balance due of approximately $224,695.45 were refinanced by petitioner's customers either

by a new note for the unpaid balances of certain old notes or by executing a new note for new machines and any old unpaid balances.

During 1954, petitioner's vice president ordered a detailed audit of its books and records including spot checks of its notes and accounts receivable and a field investigation of some of its customers. Among the conclusions reached as a result of the audit was that its accounting method of dealing with bad debts should be changed. Thus, petitioner's accountants changed from the "specific charge-off" of bad debts to the reserve method for handling bad debts. In setting up the reserve for bad debts, an amount equal to 10 percent of the notes and accounts receivable outstanding at the end of the year was used in the records of account. The 10 percent was based partly on the Federal Reserve System requirements to which the Bank was subject as trustee of the "Page Trust." The size of the reserve was also based, in part, upon the Bank's requirement that petitioner establish a 10-percent reserve for bad debts based on its outstanding accounts and notes receivable. Since 1954 and during the years in question, petitioner has utilized the reserve method for handling bad debts.

Prior to June 1954, it was the practice of petitioner to finance the notes and accounts receivable with the aid of loans from its stockholders. After that date, petitioner financed, in part, its notes and accounts receivable through the loans from the Bank. When the Bank loans to petitioner approached the legal limit which the Bank was allowed to extend to any one borrower, petitioner, during 1958, contracted for additional financing with the Finance Company of America (hereinafter referred to as Finance). The following conditions were provided in the agreement with Finance:

1. Petitioner agreed to maintain a 10-percent cash reserve with Finance for bad accounts discounted by the latter.

2. It was required to endorse the paper with full recourse.

3. It was obligated to repurchase any account from Finance when either the entire account or any part thereof became more than 90 days past due.

During petitioner's course of dealings with Finance, its reserve requirement was increased to a level of between 14 percent and 20 percent of its accounts and notes receivable discounted by Finance.

For the taxable years in question, petitioner had gross sales of $1,135,402 and $1,262,586.44, respectively. Its reserve for bad debts as of June 1, 1956, was $65,465.74.

Taking into account all of petitioner's accounts and notes receivable appearing on its books during 1956 and 1957, only $44,334.84 of the outstanding balances were charged off as bad debts during the period January 1, 1956, to December 31, 1961.

In its income tax return for 1956, petitioner deducted $9,558.48 as an addition to its reserve for bad debts. In 1957 petitioner in its

income tax return deducted $14,123.58 as an addition to its reserve for bad debts.

Respondent, in his notice of deficiency, determined that the additions to the reserve for bad debts of $9,558.48 in 1956 and $14,123.58 in 1957 were unreasonable additions and disallowed the entire amounts.

OPINION

The question presented is whether the respondent's determination that the petitioner is not entitled to deduct any amount as a reasonable addition to its reserve for bad debts for the taxable years 1956 and 1957 is in error.

Section 166(c) of the 1954 Code provides:

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the *discretion of the Secretary or his delegate*) a deduction for a reasonable addition to a reserve for bad debts. [Emphasis added.]

Under the reserve method for handling bad debts, the reserve is reduced by charging against it specific debts which become worthless during the taxable year and is increased by crediting it with additions which are reasonable within the meaning of section 166(c).

While the size of the reserve and annual additions thereto may, if the result is reasonable under the circumstances, be computed by taking a percentage of sales for the year or a percentage of the outstanding accounts receivable at the year end, the ultimate question under this section of the Code is whether the balance in the reserve at the end of the year is adequate to cover the expected worthlessness on outstanding debts and not whether the proposed addition is sufficient to absorb the estimated losses. *Black Motor Co.*, 41 B.T.A. 300, affirmed on other issues 125 F. 2d 977 (C.A. 6, 1942) ; *Platt Trailer Co.*, 23 T.C. 1065 (1955). If the reserve is already adequate to cover the accounts receivable which reasonably can be expected to become worthless, no deduction for an addition to the reserve is allowable for the taxable year. *Ira Handelman*, 36 T.C. 560 (1961).

Certain guidelines have been developed to aid in the determination of what is an adequate reserve and when additions to it are reasonable. One of these is respondent's regulations promulgated under the authority vested in him by virtue of section 166(c). It provides:

Sec. 1.166-4 Reserve for bad debts.

(b) *Reasonableness of addition to reserve*—(1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

(2) Correction of errors in prior estimates. In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.

In addition, this Court has stated that the past experience of the taxpayer in collecting accounts and notes receivable is a reliable guide for measuring probable future losses. *Home Ice Cream & Ice Co.*, 19 B.T.A. 762. Although a taxpayer may not retroactively adjust annual additions to the reserve because unanticipated future losses disclose them to have been inadequate, the subsequent loss experience of a taxpayer may, nevertheless, properly be considered as additional evidence tending either to demonstrate the reasonableness or unreasonableness of its method of computing annual additions to the bad debt reserve. *Rio Grande Building & Loan Association*, 36 T.C. 657 (1961); *Farmville Oil & Fertilizer Co.*, 30 B.T.A. 1048, affd. 78 F. 2d 83 (1935); *Apex Brewing Co.*, 40 B.T.A. 1110 (1939); *Black Motor Co., supra.* However, the estimated amount of the reserve required for any year must be measured by the conditions as they appear at the time the estimate is made and, accordingly, reliance may not be placed upon subsequent events to justify enlarging the estimate of an already reasonable reserve. *C. P. Ford & Co., Inc.*, 28 B.T.A. 156 (1933); *Carithers-Wallace-Courtenay*, 5 T.C. 942 (1945); *Farmville Oil & Fertilizer Co., supra.* Thus, evidence of the uncollectability of certain accounts subsequent to the taxable years has a limited role in our determination.

Respondent's determination with respect to additions to a reserve for bad debts carries a great deal of weight because of the discretion vested in him under section 166(c) of the 1954 Code and, accordingly, the burden of proof on a taxpayer regarding the respondent's determinations is greater than the usual burden which faces the taxpayer who seeks to overcome the presumption of correctness which attaches to respondent's ordinary notice of deficiency. *Krim-Ko Corporation*, 16 T.C. 31 (1951); *Platt Trailer Co.*, 23 T.C. 1065 (1955). Thus, the petitioner must not only demonstrate that its additions to the reserve were reasonable, but, also that respondent's action in disallowing those additions for the years in question were arbitrary, and amounted to an abuse of his discretion. *Krim-Ko Corporation, supra; Maverick-Clarke Litho Co. v. Commissioner*, 11 T.C. 1087 (1948), affd. 180 F. 2d 587.

Petitioner contends that $9,558.48 deducted in 1956 and $14,123.58 deducted in 1957 as additions to its reserve for bad debts, were reasonable to adjust its total reserve for bad debts during each of the years in question up to 10 percent of its accounts and notes receivable outstanding at the end of those years. Petitioner seeks to justify its position that the reserve should be at least 10 percent of the accounts

and notes receivable on the following grounds: First, that the trustee of 75 percent of its stock was required by the Federal Reserve System to maintain a reserve of 10 percent of those accounts as a matter of proper accounting. Secondly, that upon entering into the discounting of its commercial paper with Finance in 1958, that organization held back a reserve for doubtful accounts of over 10 percent. Thirdly, that if it were forced to be liquidated by the trustees of its stock during any subsequent year because of an unprofitable trust asset, it would be able to collect only about 50 cents out of each $1 of accounts and notes receivable. Also, in the opinion of its vice president, additions based on a reserve of 10 percent were reasonable because the fair market value of the total notes and accounts receivable was about 75 percent of their total book value.

Finally petitioner argues that we should not put a great deal of emphasis on its past practice of writing off bad debts or worthless accounts since, as it contends, that there existed a strong policy of carrying a defaulted customer indefinitely to get whatever payment it could rather than declaring the account to be in default, turning it over to an attorney for collection, and possibly offending the customer and losing the rest of the account due.

Neither party disputes the proposition that such a case as that before us must be decided on the basis of the relevant facts as found, *Apex Brewing Co.*, 40 B.T.A. 1110 (1939).

Respondent contends that the balance in petitioner's reserve for bad debts account of $65,465.74 as of January 1, 1956, was sufficient for that year and 1957. He argues that while petitioner may compute its reserve for bad debts and additions thereto by taking a percentage of the outstanding accounts and notes receivable, *Black Motor Co.*, *supra*, that percentage must produce a reasonable reserve based on the past history of collections, the circumstances existing during the years in question, and also facts which may appear subsequent to the years in question.

It is our conclusion with respect to the question presented that petitioner has not satisfied its burden of proof regarding the determination of respondent. We find, therefore, that the entire amounts constituting additions to petitioner's bad debt reserve in 1956 and 1957 must be disallowed as deductible expenses.

Petitioner has voluntarily entered into sales contracts with people of low credit rating who, in most cases, were dependent upon their incomes from the operation of petitioner's machines to pay their debts to petitioner. The payment by these customers was quite slow and petitioner, cognizant of this payment pattern, was content to do business in this manner. Many of petitioner's accounts and notes receivable were not paid by these customers, at least until 90 days had

elapsed, and in some cases not until 4 or 5 months had elapsed. It appears that petitioner was quite lenient regarding payment of the debt beyond 90 days after sale. The record bears out the fact that petitioner was willing to extend credit to its customers for periods beyond 3 months and up to 18 months in certain cases because of the financial condition of the customers. Petitioner sold additional equipment to customers whose accounts were overdue beyond 90 days, refinanced open accounts overdue beyond 90 days, consolidated overdue accounts and converted old accounts into notes receivable with terms from 1 to 18 months. Thus, petitioner attempted by these methods to keep the receivables as current as possible, extend the term of payment, and keep the customer operating to facilitate eventual payment of most of the outstanding debt.

Petitioner's history with respect to worthlessness of its accounts and notes receivables establishes that during the years 1949 through and including 1955, it had never written off more than 3 percent of its combined notes and open accounts. For the taxable year 1956 it had a total of $723,918.20 of accounts and notes receivable and of this only $185,788.61 were short-term open accounts receivable. The remaining amount was attributable to notes. For that year petitioner had an opening amount in its reserve for bad debts of $65,465.74 and at the end of that year it had written off only $2,632.40 of worthless accounts or less than 1 percent of its total notes and accounts receivable.

In 1957 it had total open accounts and notes receivable of $859,947.22 and of this amount only $198,610.81 were short-term accounts. It wrote off $991.81 as worthless accounts during this year, or less than one-half of 1 percent of its total open accounts and notes receivable. In 1958, 1959, and 1960, it had total open accounts and notes receivable of $722,807.71, $741,648.37, and $473,527.92, respectively. It wrote off approximately 1.4 percent, 1.4 and 4.5 percent, respectively, of its accounts and notes receivable during each of those years. These facts relating to its history of bad debts support the adequacy of petitioner's already existing reserve and negate the necessity of any additions.

The record indicates, as petitioner emphasizes, that it increased the amount of its annual write-off of worthless notes and open accounts in years subsequent to those in question. There are, however, too many unknown factors surrounding these increased write-offs to warrant placing any great significance in weighing petitioner's contention as to the additions claimed for the years in question. The record is barren of evidence as to the balances in its reserve account and annual additions thereto allowed in those succeeding years. In the light of this void in the record, we are unable to determine whether additions to the reserve which petitioner claimed in 1956 and 1957 were neces-

sary to bring the reserve up to an adequate level to provide for debts becoming worthless during the following years. Moreover, petitioner has not demonstrated that those factors which led to larger amounts of accounts written off in later years were either traceable to or known to exist during the years in question.

While the Bank as trustee of 75 percent of petitioner's stock was required by the Federal Reserve System to establish a 10-percent reserve on petitioner's books and while Finance in discounting petitioner's commercial paper held back over 10 percent of the value of that paper, these factors do not automatically justify a flat 10-percent reserve for income tax purposes if its existing reserve, although less than 10 percent of those accounts, was adequate to cover reasonably estimated bad debt losses.

We are not unmindful of petitioner's evidence to the effect that if the Bank as trustee were forced to liquidate petitioner in the years subsequent to those in question, it would receive only 50 percent of each dollar of accounts or notes receivable. While it may be wise to establish a reserve for anticipated losses on liquidation, from the standpoint of sound business management, we do not believe that such contingencies were contemplated under section 166(c). See *S. W. Coe & Co.* v. *Dallman*, 216 F. 2d 566, 569 (C.A. 7, 1954). Although petitioner also sought to justify its additions to the reserve on the ground that the fair market value of its total accounts and notes receivable during 1956 and 1957 were about 75 percent of their book value, it is our position that such value is not an accurate test of collectability. *Lenamon* v. *Commissioner*, 296 F. 2d 844 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court.

In the light of the foregoing, we hold that petitioner has failed to sustain his burden of proof in this case and, accordingly, we sustain respondent's determination that the entire amount of the additions to the reserve for 1956 and 1957 must be disallowed.

*Decision will be entered for the respondent.*