Lancaster Stone Products Corporation v. Commissioner.
Lancaster Stone Products Corp. v. Commissioner
Docket Nos. 4287-66, 6032-66.
United States Tax Court
T.C. Memo 1969-119; 1969 Tax Ct. Memo LEXIS 178; 28 T.C.M. (CCH) 619; T.C.M. (RIA) 69119; June 16, 1969, Filed *178 Petitioner was in the business of quarrying and selling stone and stone products. Its first full year of operations was the taxable year ended March 31, 1959. Petitioner elected the reserve method of handling bad debts and in the taxable years ending March 31, 1963, 1964 and 1965, pursuant to section 166(c) of the 1954 Code, deducted certain amounts which it claimed as necessary additions to the reserve for bad debts. Held: petitioner failed to establish that the additions to the reserve for bad debts for the taxable years ending March 31, 1963, 1964 and 1965 were reasonable within the meaning of section 166(c) of the 1954 Code. Held, further: petitioner failed to establish certain expenditures made in the taxable years ending March 31, 1963, 1964, and 1965 for such items as tickets to political dinners and other political events and distributed to various individuals, including customers, are deductible as ordinary and necessary business expenses under section 162(a) of the 1954 Code. 620 Ralph J. Gregg, 1910 Liberty Bank Bldg., Buffalo, N. Y., for the petitioner. John D. Steele, Jr., for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The respondent determined deficiencies in *180 petitioner's income taxes for the taxable years ending March 31, 1963 through 1965 in the amounts of $2,742, $3,178.08 and $3,919.25, respectively. The issues in these consolidated cases are (1) whether petitioner is entitled to deduct additions to its reserve for bad debts under section 166(c), Internal Revenue Code of 1954[1] for the taxable years here involved; and (2) whether respondent properly disallowed certain expenditures claimed by petitioner in each of the taxable years here involved as ordinary and necessary business expenses under section 162. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Lancaster Stone Products Corporation (hereinafter petitioner) is a New York corporation with its principal place of business on the date the petitions were filed and also during the taxable years here involved in Buffalo, New York. Petitioner filed Federal income tax returns for the taxable years ending March 31, 1963, 1964 and 1965 with the district director of internal revenue, Buffalo, New York. Petitioner was incorporated *181 in 1957 and its first full year of business operations was in the taxable year ended March 31, 1959. Petitioner's principal business is the quarrying, sale and delivery of stone and stone products to various categories of customers in the construction industry, including road and highway construction companies, driveway way, parking lot and paving contractors, building contractors, trucking contractors and others. The construction industry is a high-risk industry. Among the factors subjecting construction firms to financial difficulties are vagaries of the weather, under-capitalization and unanticipated and costly obstacles encountered on construction jobs. Petitioner's business is seasonal. It operates full time from April or May, depending upon the weather, until November. During the winter months petitioner's quarry is closed. Petitioner's peak seasons are in the spring and late in the fall. Any accounts receivable outstanding as of the end of a customer's operating season will generally have to be carried over by petitioner until the following season when a customer will be able to generate funds from new jobs to pay his outstanding obligation to petitioner. Petitioner, an *182 accrual basis taxpayer, elected in 1959 to use the reserve method for the deduction of bad debts. Beginning with its taxable year ended March 31, 1959 and in each taxable year thereafter petitioner has followed a consistent practice of making annual additions to its reserve for bad debts at the rate of one-half of one percent of its credit sales. Petitioner maintained a constant review of its accounts receivable. Monthly schedules of accounts receivable were prepared by an employee at which time the status of each account receivable was examined. Credit reports on various customers were obtained from outside sources. Constant efforts were made by petitioner to collect overdue accounts. Petitioner's sales on credit, including sales tax but exclusive of intercompany transactions for 1959 through 1965, the basis upon which the additions to the reserve were computed were as follows: Taxable Year Ended 3/31
Credit Sales
1959
$ 210,454
1960
973,946
1961
1,141,228
1962
1,181,952
1963
1,020,326
1964
1,062,843
1965
1,450,091
Petitioner's trade accounts receivable, other accounts receivable, and notes receivable as of March 31 of each taxable year were as *183 follows: Taxable Year Ended 3/31
Trade Acc. Rec.
Other Acc. Rec.
Notes Rec.
Total
1959
$ 18,657.20
$ 880.26
$ 19,537.46
1960
130,789.10
436.39
131,229.72
1961
174,213.23
1,913.70
$56,562.11
232,689.04
1962
$288,975.65
$2,081.56
$29,656.85
$ 32,714.06
1963
129,868.68
2,955.81
47,895.64
183,720.13
1964
171,163.91
2,071.22
31,428.90
204,664.03
1965
284,075.10
1,002.70
31,096.81
316,174.61 621 The amounts of accounts receivable as of March 31 of each taxable year which were past due in excess of 120 days or in excess of 240 days were as follows: Taxable Year Ended 3/31
Past due 120 days or more
Past due 240days or more
1959
$ 6,540.35
1960
114,551.84
$ 11,169.76
1961
139,967.70
35,634.49
1962
271,491.75
97,446.25
1963
95,737.45
46,701.06
1964
146,015.77
61,131.06
1965
266,775.93
167,523.41
The number of customers whose open accounts remained unpaid more than 120 days as of March 31, 1963, 1964 and 1965 were 20, 15 and 9, respectively. A schedule of the amounts of the annual additions to the reserve account, the bad debts charged to the reserve and the outstanding balance *184 in the reserve as of March 31 of each taxable year was as follows: Taxable Year Ended 3/31
Additions to Reserve
Charges to Reserve
Balance in Reserve
1959
$1,052.27
none
$ 1,052.27
1960
4,869.73
$ 38.59
5,883.41
1961
5,706.14
27.34
11,562.21
1962
5,909.76
872.13
16,599.84
1963
5,101.63
none
21,701.47
1964
5,314.22
none
27,015.69
1965
7,549.82
148.10
34,417.41
The balances in the reserves for bad debts account bore the following percentages to the notes and accounts receivable outstanding as of March 31, 1959 through 1965: Taxable Year Ended 3/31
Outstanding Notes and Acc. Rec.
Percent
1959
$ 19,537.46
5.3860
1960
131,229.72
4.4833
1961
232,689.04
4.9689
1962
320,714.06
5.1759
1963
183,720.13
11.8124
1964
204,664.03
13.1991
1965
316,174.61
10.8850
Generally, petitioner's annual sales to contractors performing bonded jobs comprised from one-third to one-half of petitioner's total annual sales. Where materials were sold to contractors performing bonded jobs for the State of New York, the petitioner (as materialman) was afforded statutory remedies for claims against such contractors under *185 section 137 of the State Finance Law and Article 3-A of the State Lien Law, McKinney's Consolidated Laws of New York. One of petitioner's largest customers did exclusively state and county highway work, which was always under bond. Petitioner reported the following income on its income tax returns for the taxable years ended March 31, 1958 through 1965: Taxable Year ended 3/31
Net Income (or loss)
Loss Carry- Forward
Taxable Income
1958
$ (5,596.20)
$ 5,596.20
1959
(137,469.68)
137,469.68
1960
117,655.53
(117,655.53)
1961
129,889.00
(25,410.00)
$104,478.91
1962
117,016.42
117,016.42
1963
104,259.00
104,259.00
1964
115,678.38
115,678.38
1965
300,487.61
300,487.61
Petitioner claimed deductions as advertising expenses, certain expenditures made in 1963, 1964, and 1965 for tickets to award dinners, outings or similar functions of county and town democratic and republican committees, and functions sponsored by various associations of supervisors on the town, county and state level. Some of these 622 tickets were distributed by petitioner to its customers and some tickets were distributed to its competitors. The parties *186 have stipulated that the expenditures involved were $172.50, $856.50 and $148 in the taxable years ending March 31, 1963 through 1965, respectively, and have also stipulated the names of the various payees. Respondent in his statutory notice of deficiency disallowed altogether the deductions claimed by petitioner for additions to the bad debt reserve account in the taxable years ended March 31, 1963, 1964, and 1965 in the respective amounts of $5,102, [2] $5,314.22 and $7,549.82. This left petitioner with a reserve for bad debts for the taxable years ended March 31, 1963 and 1964 of $16,599.84 (which, since no charges were made to the reserve, was the same as the balance in the reserve account as of March 31, 1962) and of $16,451.74 (reflecting a charge to reserves of $148.10) as of March 31, 1965. This resulted in a ratio of the reserve for bad debts to total outstanding receivables during the taxable years here involved as follows: Taxable Year Ended 3/31
Outstanding Receivables
Ratio of Reserve to Receivables
l1963
$183,720.13
9.04
1964
204,664.03
8.11
1965
316,174.61
5.20
*187 Respondent also disallowed deductions for certain itemized expenditures, such as tickets to political dinners and other events, claimed by petitioner as advertising expenses in the taxable years ended March 31, 1963, 1964, and 1965 in the respective amounts of $172.50, $856.50, and $148. Opinion The first issue is whether respondent correctly determined that petitioner was not entitled to any further additions to its reserve for bad debts in the taxable years ended March 31, 1963, 1964 and 1965. Section 166(c) provides in lieu of specific deductions for bad debts "there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." [3] Under the reserve method specific debts which become worthless are charged against the reserve, thus reducing the credit balance, and the taxpayer is then allowed to increase the reserve by an addition to the reserve which is necessary to bring the credit balance to an appropriate level. Roanoke Vending Exchange, Inc., 40 T.C. 735 (1963). *188 In essence, the reserve for bad debts constitutes an estimate of the loss which can reasonably be expected to result from debts outstanding at the end of the taxable year. The ultimate question is whether the credit balance in the reserve is adequate to cover such anticipated losses. Ira Handelman, 36 T.C. 560 (1961). If the reserve is already adequate to cover the expected losses from outstanding debts, no deduction for an addition to the reserve is allowable for the taxable year. Roanoke Vending Exchange, Inc., supra. In view of the discretion vested in respondent under section 166(c), it has been held that his determination with respect to additions to the reserve for bad debts is entitled to more than a mere presumption of correctness. Dixie Furniture Company v. Commissioner, 390 F. 2d 139 (C.A. 8, 1968), affirming a Memorandum Opinion of this Court; Roanoke Vending Exchange, Inc., supra.Accordingly, the petitioner must not only show that its additions to the reserve in each of the three taxable years here involved were reasonable, but also that respondent's action in disallowing these additions amounted to an abuse of *189 his discretion. Krim-Ko Corporation, 16 T.C. 31 (1951). At the end of four years of business operations petitioner showed a balance in its reserve for bad debts account of $16,599.84 as of March 31, 1962. Petitioner contends that it is entitled to deductions for further additions to its reserve for bad debts in the 623 taxable years ended March 31, 1963, 1964, and 1965 in the respective amounts of $5,101.63, $5,314.22, and $7,549.82, which would bring the balance in the reserve account up to $34,417.41 as of March 31, 1965. Petitioner's total accounts and notes receivables as of March 31, 1962, was in the amount of $320,714.06, and the balance in the reserve for bad debts account as of that date amounted to 5.2 percent of total receivables. Petitioner's total receivables as of March 31, 1963, 1964, and 1965 were in the respective amounts of $183,720.13, $204,664.03, and $316,174.61 so that, with the additions to the reserve account claimed by the petitioner in those taxable years, the resulting balances in the reserve account as of March 31, 1963, 1964, and 1965 would constitute 11.8 percent, 13.2 percent and 10.9 percent of the receivables outstanding as of those *190 respective dates. We have carefully examined the arguments and evidence put forth by petitioner in justification of the disputed additions to its reserve for bad debts account and it is our conclusion that petitioner has not satisfied its burden of proof with respect to the determination made by respondent. Petitioner refers to certain disadvantages it encountered when it went into business in 1958. Petitioner testified that contractors in the area were customers of existing stone suppliers and that petitioner had to be content with the business of those contractors who were marginal credit risks. Nothing in the record supports this contention. It does not appear that the contractors who became customers of petitioner posed any special risk problems apart from the general risks attendant upon all contractors engaged in the construction business. Moreover, the diligence of petitioner's employees in gathering credit data on various customers made it highly unlikely that any appreciable sales would knowingly be made to customers with a dubious credit status. In some measure, all of this is vividly demonstrated by the rather remarkable record shown by petitioner in collecting its debts *191 over the first seven years of its operations. The only charges to its reserve for bad debts made by petitioner on account of worthless debts were the following: $38.59, $27.34, and $872.13 in the taxable years ended March 31, 1960, 1961 and 1962, and a charge of $148.10 in the taxable year ended March 31, 1965. We have considered the duration of time that some of the receivables remained outstanding before they were finally collected. This factor must be reviewed against the background of petitioner's seasonal work. There was testimony that customers with bills unpaid at the end of the construction season in the fall would often wait until revenues came in from work in the following year in order to pay outstanding bills. Thus, it was quite normal as of the end of its taxable year on March 31 to have some receivables outstanding for periods of more than 120 days. There is no merit to petitioner's argument that a more accurate measure of the adequacy of petitioner's reserve for bad debts accounts would be the receivables outstanding as of the end of September, at the peak of its busy season, rather than as of March 31. Respondent's regulations explicitly provide that what constitutes *192 a reasonable addition to a reserve for bad debts under section 166(c) "shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition." There is no justification for ignoring this provision in seeking a proper measure for annual additions to a reserve for bad debts. We might also point out that the comparatively higher totals of outstanding receivables in September when contrasted with the totals as of the end of the taxable year on March 31 merely highlights the efficacy and promptness of the payments of bills by the majority of petitioner's customers over the winter months. Petitioner singles out two accounts as of March 31, 1963, the Galente account in the approximate amount of $4,000 and the Dump Truck Service account in the amount of $2,349.57, and contends that they were actually worthless as of that time although admittedly petitioner had not yet elected to charge these two accounts against its reserve for bad debts account. Petitioner then argues that because these two accounts had not been charged off during the taxable year ending March 31, 1963, the credit balance in the reserve was unrealistic and inadequate to cover anticipated *193 losses. We cannot agree. As we have indicated earlier, the adequacy of the reserve is to be measured in light of the conditions which exist at the time the estimate is made. There is testimony that respondent was aware of these two accounts and that he took them into consideration, along with other factors, in reaching a conclusion as to the adequacy of petitioner's reserve for bad debts as of March 31, 1962, in the 624 amount of $16,599.84 and the need, or lack of need, for any further additions to the reserve in the three following taxable years. It is worth mentioning in connection with these two shaky accounts that while Dump Truck Service filed a petition in bankruptcy late in 1962 it did have substantial assets and that partial recovery by petitioner of the amount owed was possible and, in fact, actually did occur some time after March 31, 1965. As to the Galente account, we are told that petitioner had difficulty making collection on notes amounting to $4,000, plus interest, and that Galente was having troubles with other creditors. We cannot say that the presence of these two shaky accounts, considered together with all the remaining factors, renders inadequate *194 the credit balance on the reserve for bad debts account as determined by respondent for the taxable years here involved. It is difficult to follow petitioner's argument that respondent's determination was somehow unreasonable because he purportedly used as a test the rule stated in Black Motor Co., 41 B.T.A. 300 (1940), affirmed on other issues, 125 F. 2d 977 (C.A. 6, 1942). In that case, the respondent was upheld in his determination that the taxpayer's reasonable reserve for bad debts was a percentage of its accounts receivables no greater than its average percentage of bad debts over the previous six-year period. Although the use of the formula was upheld by the Board as reasonable under the facts of that case, the Board also made the following observation: The test, however, is whether the amount ultimately determined, regardless of formula, constitutes a reasonable addition to petitioner's reserve. What constitutes a reasonable addition will depend upon the facts and circumstances of the business engaged in with relation to general business conditions. A method or formula that produces a reasonable addition to a bad debt reserve in one year, or a *195 series of years, may be entirely out of tune with the circumstances of the year involved. * * * Here, respondent determined that the additions by petitioner to its reserve during the three taxable years here involved increasing the credit balance from $16,599.84 as of March 31, 1962, to $34,417.41 as of March 31, 1965, were unreasonable additions. In other words, the credit balance of $16,599.84, when reviewed in the light of conditions existing as of March 31, 1963, 1964, and 1965, was deemed adequate to meet petitioner's anticipated losses. If we look at petitioner's past history of bad debts for its first four taxable years of operation ending March 31, 1962, we find no more than three minor charge-offs to the reserve account on account of specific bad debts - $38.59, $27.34, and $872.13 in the taxable years ended March 31, 1960, 1961, and 1962, respectively. It seems obvious to us that, on this record, petitioner cannot complain that the allowable credit balance in its reserve account was determined by looking at its bad debt history. Respondent did give some consideration to petitioner's prior bad debt history, but he also considered other factors as well in disallowing any *196 further additions during the taxable years ended March 31, 1963, 1964, and 1965 to the reserve account which had a credit balance of $16,599.84 as of March 31, 1962. Petitioner's credit sales appear to have leveled off in the taxable year ended March 31, 1962, in the vicinity of slightly more than $1,000,000, with a slight decline in the taxable years ended March 31, 1963 and 1964, and an increase to about $1,450,000 in the taxable year ended March 31, 1965. It also appears that petitioner's total outstanding receivables, which were $320,714.06 as of March 31, 1962, were in the lesser amounts of $183,720.13, $204,664.03, and $316,174.61 as of March 31, 1963, 1964, and 1965, respectively. It should also be noted that there were no charge-offs to the reserve account for specific bad debts in the taxable years ended March 31, 1963 and 1964, and a minor charge-off of $148.10 in the taxable year ended March 31, 1965. In gauging the risk of anticipated losses from outstanding debts, it is significant that a large portion of petitioner's credit sales (from one-third to one-half) each year were to customers doing bonded jobs under which materialmen are protected. Petitioner's largest debtor *197 during the three taxable years here involved did nothing but bonded work. Two other large debtors during this same period did about 50 percent of their work on bonded jobs. If we look at these debtors alone, we find that the total outstanding receivables from this group were in the approximate amounts of $45,700, $63,500, $115,000, and $231,700 as of March 31, 1962, 1963, 1964, and 1965 respectively, indicating a trend in 625 petitioner's sales during this period to customers involving less risk of nonpayment. It is evident that petitioner's position as a materialman in such situations was strengthened against losses ensuing from unpaid obligations. There was also testimony that where petitioner's customers were performing work on public improvements for the State, additional statutory provisions existed to secure payment to persons who supplied labor or material to the contractor or subcontractor. See section 137, State Finance Law, McKinney's Cons. Laws of New York. Much of the evidence presented by petitioner is characterized by generalities and broad statements which, upon analysis, are not persuasive in showing that petitioner's claimed additions to the reserve account *198 were reasonable. Much of petitioner's argument has to do with contingencies that could conceivably arise, but failure of respondent to allow for mere contingencies is not an abuse of his discretion. S. W. c/oe & Co. v. Dallman, 216 F. 2d 566 (C.A. 7, 1954). Apart from the evidence that petitioner's customers are for the most part engaged in the high-risk construction industry, we are given little information or convincing evidence of what would be deemed as adequate reserves for others in petitioner's position. Although not conclusive, since the question depends ultimately upon petitioner's own experience, such evidence of the expenses of others would be helpful, especially here where petitioner's quarry had only been in operation since the taxable year 1959. We have considered all of the evidence and conclude that petitioner has not met its requisite burden of proof to show that its claimed additions to the reserve for bad debts account in the taxable years ended March 31, 1963, 1964, and 1965, were reasonable. Nor has petitioner demonstrated that respondent's action in disallowing these additions amounted to an abuse of his discretion. We hold for the respondent on *199 this issue. The next issue is whether respondent correctly disallowed deductions claimed by petitioner as advertising expenses in the taxable years ended March 31, 1963, 1964, and 1965, in the respective amounts of $172.50, $856.50, and $148. The parties have stipulated an itemized list of the individual expenditures involved. [4] Respondent's position is that such expenditures are not ordinary and necessary business expenses within the meaning of section 162 and, further, that petitioner has not satisfied the requirements of section 274 as to such expenditures. Section 274, which imposed new substantiation requirements for entertainment and related expenses, was introduced by the Revenue Act of 1962. *200 (Above taxable years ended March 31.) Petitioner informs us on brief that the disallowed items were, for the most part, tickets to dinners and outings sponsored by town or county political committees, town or county boards of supervisors, associations of town supervisors and to honor political candidates. Petitioner also states on brief that it "does not contend that these expenditures did not directly or indirectly inure to or for the use of a political party or a political candidate * * *." Apart from some testimony by an employee of petitioner that these tickets were distributed to various individuals, including customers of petitioner, the record is barren of any evidence which would even remotely establish the relationship of these expenditures to petitioner's business. Quite apart 626 from the failure of proof, it would appear that the very nature of these expenditures for obviously political purposes would be sufficient reason to deny their deductibility. [5] See section 1.162-20(c), Income Tax Regs.; see also I.T. 3276, 1939-1 C.B. (Part 1) 108. We sustain respondent on this issue. *201 Decisions will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. It has been stipulated by the parties that the addition to reserve for the taxable year ended March 31, 1963 was $5,101.63.↩
3. Section 1.166-4 of the Income Tax Regulations provides in part as follows: (b) Reasonableness of addition to reserve - (1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. (2) Correction of errors in prior estimates. In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.↩
4. 1963 Lancaster Democratic Committee $ 19.00 Chester R. Hardt 100.00 Samuel Salva, Lancester Domocratic Committee 40.00 Town of Clarence Republican Com- mittee 13.50 $172.50 1964
N. J. Nichter
$ 15.00
Democratic Club
25.00
N. J. Nichter
30.00
Samuel Saeva, Chairman
20.00
Samuel Saeva, Chairman
20.00
Friends of Edward Cook
250.00
Francis Eldred
50.00
Erie Co. Board of Supervisors
12.00
Herbert J. Niebergall
100.00
John Patz, Chairman
25.00
Frank Tetnowski
20.00
Erie Co. Board of Supervisors
18.00
Erie Co. Assn. of Town Supervisors
$128.00
Erie Co. Board of Supervisors
13.50
Lucien A. Ferbert
20.00
Award Dinner
30.00
Award Dinner
30.00
Geo. Gunther, Outing Chairman 50.00
$856.50
↩ 1965
Erie County Association of Town Supervisors
$ 15.00
Town of Amherst
21.50
Erie County Highway
22.00
County Comptroller's Outing
22.50
Erie County Board of Supervisor's Outing
12.00
New York State Assn. of Town Super- visors 55.00
$148.00
5. Section 276, which disallows a deduction for certain indirect contributions to political parties including admissions to political dinners and similar programs, was enacted as part of the Tax Adjustment Act of 1966 and is applicable only to taxable years beginning after December 31, 1965. The following observation of the Senate Finance Committee Report in connection with section 276 is of some interest: In the case of payments for admission to dinners or programs held for the purpose of raising funds for a political party or candidate, it appears unlikely that a deduction is available under present law * * *. S.Rept. No. 1010, 89th Cong., 2d Sess. (1966), 1966-1 C.B. 476↩, 504.