WESTCHESTER DEVELOPMENT COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6315-72. Filed November 14, 1974.

*Robert L. Waters,* for the petitioner.
*Daniel A. Taylor, Jr.,* for the respondent.

FAY, *Judge:* Respondent has determined deficiencies in the Federal income taxes of petitioner in the amounts of $47,224.77 and $311,871.79 for fiscal years ended February 29, 1968, and February 28, 1969, respectively.

The issues to be decided are:

(1) Whether the gain recognized by the petitioner on sales of real estate other than single-family dwelling sites was capital gain or ordinary income;

(2) Whether the additions which petitioner made to its bad debt reserve for the years in issue were reasonable in amount, and whether respondent abused his discretion in disallowing deductions claimed by reason of those additions; and

(3) Whether petitioner was entitled under section 1033[1] to delay the recognition of gain realized on the sale of land to the Spring Branch Independent School District.

FINDINGS OF FACT

Certain facts have been stipulated by the parties and are incorporated herein by this reference.

Petitioner Westchester Development Co.[2] was a corporation organized and existing under the laws of the State of Texas. Its principal place of business was in Houston when the petition was filed herein. For its fiscal years ended February 29, 1968, and February 28, 1969, petitioner filed its corporate income tax returns with the district director of internal revenue, Austin, Tex. Upon its incorporation and throughout the period under

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

[2] Petitioner was originally known as Westchester Corp.

consideration, petitioner's sole shareholders were E. G. McMillan and Adrian E. Kachel.

## Issue 1. The Sales of Real Estate Other Than Single-Family Dwelling Sites [3]

In 1950 E. G. McMillan (McMillan) entered the employ of Cantrell & McMillan, a firm in which he later became a partner and with which he was to remain associated until its dissolution in 1961. In the early years of his association with the firm, it engaged in commercial and industrial contracting; but after 1953 its activities were confined to residential construction. After the firm was dissolved, McMillan engaged in home construction on a joint venture basis with Adrian E. Kachel (Kachel) who also had been in Cantrell & McMillan's employ.

McMillan and Kachel formed the petitioner on March 9, 1966, intending that it acquire and develop 240 acres of undeveloped land on the western outskirts of Houston, Tex., known as the Statti tract. Petitioner acquired this tract on July 22, 1966, and having done so, was required to advise the city planning commission as to its plans for the disposition of the property which was thenceforth known as the Westchester subdivision.[4] To this end a preliminary plat dated July 1966 was submitted to the commission.

For purposes of its development the subdivision was to be divided into three sections, identified by number in sequence from south to north. The entire first section and considerable portions of the second and third were to be subdivided into single-family dwelling sites. But portions of sections 2 and 3 which fronted on Memorial Drive and Dairy-Ashford Road[5] were considered unsuitable for home construction due to their proximity to major thoroughfares and were consequently set aside as reserve tracts.[6] No plan had as yet been devised for the use of the reserve tracts when the preliminary plat was sub-

---

[3] We do not now consider the sale of a tract of land to the Spring Board Independent School District. That sale shall be treated separately below.

[4] The latter half of the 1960's was to witness the rapid development of the area in which the Westchester subdivision was located. As a result of that development, the value of real estate in the area was to appreciate substantially in the aforesaid period.

[5] Memorial Drive and Dairy-Ashford Road were the major thoroughfares in the vicinity of the Westchester subdivision. The former traversed the subdivision between secs. 2 and 3; the latter bordered the subdivision on the east.

[6] These reserve tracts were seven in number and identified by letter. Reserves A through C were in sec. 2; reserves D through G were in sec. 3.

mitted; but petitioner's management did contemplate that offers to purchase frontage along Memorial Drive and on Dairy-Ashford Road might be forthcoming from parties wishing to develop sites for commercial use.

Because section 1 was heavily wooded, McMillan and Kachel adjudged it ready for immediate residential construction. In order that construction might begin, a plat of the section was formally recorded on January 5, 1967.[7] As sound planning dictated that contiguous sections be developed sequentially, a plat of section 2 was recorded on August 23 of the same year.

Under the plan devised by McMillan and Kachel for the development of the Westchester subdivision, it was not contemplated that petitioner actually become engaged in the construction of homes. Rather, petitioner was to subdivide into single-family dwelling sites the portions of the tract which were suitable for that use. These residential lots were then to be sold to construction companies who would build homes on them. Petitioner was to provide the construction companies with such financing as was necessary for their participation in the project and in consideration thereof was to share in the profits realized by the companies on the sales of the homes which they built in the subdivision. Petitioner's management and staff, together with the builders working at the subdivision, also entered into an active advertising campaign to encourage the sale of the single-family residential properties available in sections 1 and 2. During the period under consideration, marked progress was made in developing the subdivision according to the aforesaid design.

Certain portions of the subdivision, sold in the years now before us, were not sold as single-family dwelling sites. These transactions have given rise to the instant litigation. Before undertaking to describe them in detail we note that none of these transactions received its original impetus from petitioner; rather in each case petitioner was approached by the purchaser, either directly or through a representative. Such solicitation of purchasers as was engaged in by petitioner was aimed solely at promoting sales of single-family dwelling sites in the subdivision.

---

[7] The recording of a formal plat was a prerequisite to the installation of streets and utilities.

On July 17, 1967, the northeast corner of section 2, located in reserve C [8] of that section, was sold to the Mobil Oil Co. which wanted this property, located at the intersection of Memorial Drive and Dairy-Ashford Road, as a site for a service station.

On December 6, 1967, petitioner sold two tracts in section 3 to Pitcock & Williams, a firm of apartment house developers who planned to construct a multiple-dwelling complex on the land which they acquired. One of the tracts sold to Pitcock & Williams had been designated as blocks 21 to 24, section 3, on the preliminary plat and the other as a portion of reserve D, section 3. Until the time of this transaction, McMillan and Kachel had anticipated that blocks 21 to 32, section 3, would be subdivided and sold as single-family dwelling sites; but the purchase of blocks 21 to 24, section 3, by a firm of apartment house developers caused McMillan and Kachel to reassess these plans.

On June 11, 1968, petitioner formally recorded a plat for section 3, on which none of the section appeared subdivided into single-family dwelling sites. Petitioner was at that time engaged in negotiating terms with John Clayton Builder, Inc. (Clayton), for the construction of an apartment house complex for petitioner's own account on a site in the northwest corner of the subdivision, which had been designated as residential blocks 28, 29, and 30, section 3, on the preliminary plat. Initial plans for the project were completed in October 1968, and final plans in January 1969. A partnership to further the project was formed by petitioner and Clayton on February 20, 1969. During this same period petitioner also entertained the idea of constructing an apartment house project in conjunction with one James Powers on a site in reserve tracts E and F, section 3. Preliminary plans for the project were prepared in the fall of 1968, and final plans were completed in February 1969.

Petitioner's purpose in recording the plat of section 3 on June 11, 1968, had been to facilitate the realization of plans such as these. None of the apartment house projects planned by petitioner was ever to be built, however, due to difficulties encountered by petitioner in obtaining the necessary financing.

On March 28, 1968, reserve A, section 2, was purchased by Bill Beck (Beck), a Dallas apartment house builder. Wishing to expand into the Houston area, Beck had approached petitioner

[8] In our findings of fact and opinion relating to issue one, we shall refer to all tracts sold by their designations on the preliminary plat.

through a real estate agent. At Beck's insistence, petitioner also granted him an option to purchase blocks 25 and 26, section 3,[9] and another to purchase a portion of reserve F, section 3. Blocks 25 and 26 were purchased by Beck's nominee on July 26, 1968, pursuant to an exercise of the first option.[10]

In the fall of 1967 petitioner's management first considered building a shopping center on a site in reserve F, section 3, which enjoyed easy access to Memorial Drive. A leasing agent was contacted as were an architect and several prospective tenants. Discussions were also conducted with parties who might have been willing to finance the project. While this possibility was being explored, Humble Oil & Refining Co. (Humble) expressed an interest in purchasing the southeast corner of reserve F, section 3. At first petitioner was hesitant to sell the lot to Humble because its plans for the development of the contiguous property were as yet incomplete; but it did eventually agree to the sale which took place on April 1, 1968.

The American Savings & Loan Association (American) owned a two-elevenths undivided interest in the site on which petitioner proposed to build its shopping center, and in reserve C, section 2, which lay on the opposite side of Memorial Drive. American had acquired this interest in consideration of its having financed petitioner's acquisition of the Statti tract. As American did not wish to participate in the development of petitioner's shopping center, petitioner offered to purchase American's interest in reserve F, section 3; furthermore, to forestall the possibility of a competing shopping center's opening across Memorial Drive, petitioner also offered to buy American's interest in reserve C, section 2. Before the necessary contracts of sale could be executed, however, a realtor approached petitioner on behalf of the firm of Lister & Hauck with an offer to purchase reserve C, section 2. Petitioner realized that its shopping center plans would have to be foregone if Lister & Hauck's offer were accepted; for they were proposing to build a shopping center of their own on the tract which they were offering to purchase. Nevertheless, McMillan did not feel free to decline their offer, fearing that to do so would be to antagonize American unduly; for Lister &

[9] When the preliminary plat had been prepared it was anticipated that blocks 25 and 26 would be divided into sites for single-family dwellings.

[10] The second option was exercised on Nov. 15, 1968, but petitioner recognized no gain on that sale during the years now before us due to an election under sec. 453.

Hauck were willing to pay a better price per square foot for reserve C, section 2, than petitioner could afford to pay American for its interest in that property. After protracted negotiations, reserve C, section 2, was sold to Lister & Hauck on July 6, 1968.

Petitioner carried its real estate holding on its books in several accounts, one set of accounts being maintained for residential lots, the other for acreage tracts. Prior to the recording of a plat subdividing a tract into residential lots, the tract was carried on the books as undeveloped acreage. After the recording of such a plat, the tract would be carried as lots available for sale to customers.

During the years now before us, petitioner reported the following amounts as capital gain recognized on the sales described above: [11]

| FYE FEB. 29, 1968 | | |
| Description | Date of sale | Reported gain |
| --- | --- | --- |
| Northeast corner, sec. 2 _____ | July 17, 1967 | $98,087.94 |
| Blocks 21-24, sec. 3 [12] _____ | Dec. 6, 1967 | 6,697.50 |
| Part of reserve D, sec. 3[12] _____ | Dec. 6, 1967 | 1,375.88 |
| FYE FEB. 28, 1969 | | |
| Description | Date of sale | Reported gain |
| Reserve A, sec. 2 _____ | Mar. 28, 1968 | $148,714.00 |
| Southeast corner, sec. 3 _____ | Apr. 1, 1968 | 107,074.00 |
| Reserve C, sec. 2 _____ | July 6, 1968 | 265,641.00 |
| Blocks 25 and 26, sec. 3[12] _____ | July 26, 1968 | 1,120.00 |

By timely statutory notice respondent denied capital gain treatment with respect to the aforesaid sales.

## Issue 2. Additions to the Bad Debt Reserve

As we have noted above, petitioner sold lots to the builders engaged in construction at the Westchester subdivision, supplied them with construction financing, and became entitled to a

---

[11] Two other sales were made by petitioner during fiscal year ended Feb. 28, 1969. On Nov. 4, 1968, Pitcock & Williams bought a small piece of land adjacent to the tracts which they had previously purchased; and on Nov. 15, 1968, a portion of reserve F, sec. 3, was sold pursuant to an exercise of the second option granted to Beck. Gain was recognized on neither of these sales in the years now before us due to an election to report the gain under sec. 453.

[12] Sec. 453 was elected for purposes of reporting the gain on these sales.

participation in their profits. At the close of the fiscal years now before us, petitioner was owed receivables[13] by the several builders in the following amounts:

| Name of builder | Amount of receivable 1968 | 1969 |
|---|---|---|
| Bill Whitsett Builder, Inc. | $16,195.40 | $36,976.19 |
| Blaine Fitts Builder, Inc. | 17,977.07 | 40,382.30 |
| John Clayton Builder, Inc. | 75,491.21 | 92,448.54 |
| Jerry Kirkpatrick Builder, Inc. | 10,374.20 | 17,448.26 |
| B. B. Brooks Builder, Inc. | 8,921.63 | 21,282.79 |
| Hollace Bowden Builder, Inc. | 15,529.82 | 14,262.06 |
| Jamie Hamm Builder, Inc. | 16,530.24 | 17,730.01 |
| Charles Coons Builder, Inc. | 14,257.85 | 25,477.94 |
| Clint Priess Builder, Inc. | 26,366.43 | 26,458.61 |
| Jamie Hamm, individually | 6,846.51 | 2,326.17 |
| Ed Ramsey Builder, Inc. | 17,764.11 | 14,344.98 |
| Donald Walstad Builder, Inc. | 7,935.96 | 18,170.57 |
| Julius Urech Builder, Inc. | 0 | 18,064.69 |
| Virgil Verbarg Builder, Inc. | 0 | 23,803.91 |
| Ray Dunham Builder, Inc. | 0 | 12,753.83 |
| Charles Wilder Builder, Inc. | 0 | 11,523.66 |
| Westchester Sales | 0 | 2,500.00 |

For the most part petitioner's obligors were thinly capitalized one man or family corporations, the major source of whose working capital was construction loans.

Petitioner elected to set up a reserve for bad debts under section 166(c); but with respect to its first year of operation,[14] no addition to the reserve was made. For the years now before us, the petitioner increased the reserve by $14,910 and $55,590, respectively. The first of these additions was intended to equal 10 percent of the petitioner's accounts receivable outstanding at the close of the year ended February 29, 1968; but due to a miscalculation by petitioner's accountant, the reserve was increased by the substantially lower figure of $14,910. The $55,590 was meant to approximate an addition which petitioner was advised to make to its bad debt reserve by a nationally known firm of certified public accountants whom petitioner had engaged

---

[13] These receivables consisted of notes receivable, accrued interest, and accrued participation in profits.

[14] The first fiscal year of the corporation began on Mar. 9, 1966, and ended on Feb. 28, 1967.

to do an audit for its fiscal year ended February 28, 1969.[15] In calculating the addition which it was to recommend, the accounting firm investigated the records of the builders indebted to petitioner and thereby determined the net worth of each. A representative of the firm then interviewed McMillan who was knowledgeable both as to the history of the debtor corporations and as to the business acumen of their managements.[16]

By timely statutory notice respondent wholly disallowed the deduction of $14,910 claimed by petitioner as an addition to the reserve for bad debt for fiscal year ended February 29, 1968, and disallowed the deduction for the succeeding fiscal year to the extent of $6,648.

*Issue 3. The Sale of Land to the Spring Branch Independent School District*

Soon after petitioner acquired the Statti tract, the Spring Branch Independent School District expressed an intention to

---

[15] The accounting firm advised petitioner with respect to each of its debtors whether an addition to the reserve was warranted at that time, and if so, in what amount. The specific recommendations made as to each debtor were as follows:

| Debtor | Recommended addition | Recommended addition (rounded) |
|---|---|---|
| Whitsett | $4,444 | $4,500 |
| Fitts | 3,316 | 3,400 |
| Clayton | No provision | |
| Kirkpatrick | No provision | |
| Brooks | 14,485 | 14,500 |
| Bowden | 8,796 | 8,800 |
| Hamm, Inc. | 6,275 | 6,300 |
| Coons | No provision | |
| Priess | No provision | |
| Ramsey | No provision | |
| Walstad | 12,250 | 12,300 |
| Urech | 2,597 | 2,600 |
| Verbarg | 1,843 | 1,900 |
| Dunham | No provision | |
| Wilder | 680 | 700 |
| Westchester Sales | No provision | |
| Total | 54,686 | 55,000 |

[16] No charges were made against the reserve in the fiscal years ended Feb. 28, 1967, Feb. 29, 1968, and Feb. 28, 1969. In succeeding years, however, the following charges were made:

| FYE | Amounts charged |
|---|---|
| Feb. 28, 1970 | $35,385 |
| Feb. 28, 1971 | 117,256 |
| Feb. 29, 1972 | 65,851 |

acquire a portion of the tract, north of Memorial Drive. However, in a letter dated March 2, 1967, the attorneys for the school district offered to purchase approximately 10 acres out of reserve A, section 2, and advised that condemnation proceedings would be initiated were the offer declined. Petitioner refused the school district's offer whereupon a condemnation suit was begun on April 11, 1967; but the school district took a voluntary nonsuit, without prejudice to refiling, after the parties agreed to open negotiations.

On March 26, 1968, petitioner agreed to sell the school district approximately 9.61 acres of land in section 2, situated immediately to the south of reserve A. It had originally been planned that this site would be divided into residential lots; but in view of the impending purchase by the school district a new plat designating the 9.61 acres as reserve D, section 2, was filed on July 15, 1968, 2 days prior to the closing. Petitioner realized a gain of $123,018 on this transaction.

During its fiscal year ended February 28, 1970, petitioner purchased a 2,999-acre tract for $2,851,150. It carried this tract on its books and records as replacement property for the land which it had sold to the school district. Petitioner intended to subdivide the replacement property into residential lots for sale to the general public. On its corporate income tax return for its fiscal year ended February 28, 1969, it elected to defer recognition of the gain realized on the sale of property to the school district under section 1033 and reduced its basis in the 2,999-acre tract by $123,018. However, by timely statutory notice, respondent determined that petitioner must recognize the gain realized on the sale of land to the school district as ordinary income in the fiscal year ended February 28, 1969.

OPINION

## Issue 1. The Sales of Real Estate Other Than Single-Family Dwelling Sites

Section 1221(1) provides that the term "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In determining the character of the gain recognized by petitioner on the transaction in controversy, we must as a threshold matter determine the kind of assets which it was within the ordinary

course of petitioner's trade or business to sell. *Robert L. Adam,* 60 T.C. 996, 999 (1973).[17] Time and again the courts have rehearsed the several factors to be considered in making such a determination. They include the frequency with which the taxpayer sold assets of the type in question; the continuity of his activities relating to such sales over a period of time; and the effort expended by the seller or his agents to enhance the marketability of assets of that kind, either by working improvements directly upon them or by soliciting purchasers for them. Underlying these pronouncements is the concept of a business as an ongoing enterprise systematically conducted, designed to produce a profit, to which the entrepreneur or his agents devote substantial time, skill, and resources, *Snell v. Commissioner,* 97 F.2d 891 (C.A. 5, 1938), affirming a Memorandum Opinion of the Board of Tax Appeals; *United States v. Winthrop,* 417 F.2d 905, 911 (C.A. 5, 1969); *Bedell v. Commissioner,* 30 F.2d 622 (C.A. 2, 1929), affirming 9 B.T.A. 270 (1927); *Galena Oaks Corp. v. Scofield,* 116 F. Supp. 333, 335 (S.D. Tex. 1953), affd. 218 F.2d 217 (C.A. 5, 1954); *Boomhower v. United States,* 74 F. Supp. 997, 1002 (N.D. Iowa 1947); *William B. Howell,* 57 T.C. 546 (1972); *Robert L. Adam, supra.*

McMillan and Kachel each had had considerable experience in the construction and sale of single-family dwellings prior to the formation of petitioner. They caused petitioner to acquire the Statti tract, intending that it be developed in large part as a community of single-family dwellings in which residential properties would be available for sale to the general public. Toward the realization of this end they directed considerable efforts as a result of which substantial portions of the Statti tract were subdivided and sold as sites for the construction of single-family homes. We hold that these sales were within the ordinary course of petitioner's business. While engaged in this undertaking, petitioner sold tracts of land in the Westchester subdivision, which had not been subdivided into sites for single-family dwellings. The sales of these tracts are the subject of this litigation. None of these sales received its initial impetus from solicitation of the purchaser by the petitioner. Rather, in each of these instances the negotiations culminating in the sale were begun at the behest of the purchaser or of an agent acting on his

[17] See also *S. O. Bynum,* 46 T.C. 295, 302 (1966).

behalf. The appreciation in value of the tracts sold in these transactions was in no case the result of efforts expended upon the property by the petitioner with a view to enhancing its marketability. Lastly, the sales of these tracts constituted but five sets of transactions over a 2-year period. We therefore hold that these sales were not made within the ordinary course of petitioner's business, *Dunlap v. Oldham Lumber Co.,* 178 F. 2d 781, 785 (C.A. 5, 1950); *Maddux Construction Co.,* 54 T.C. 1278 (1970); *Robert L. Adam, supra.* This holding, however, does not insure capital gain treatment with respect to the sales of these tracts. For the reach of section 1221(1) is not limited to assets *sold* in the ordinary course of business. Rather it extends to all assets *held for* sale in the ordinary course of the seller's business, *Donald J. Lawrie,* 36 T.C. 1117 (1961). In attempting to determine the character of the gain recognized on the transactions in issue, we must therefore ascertain the purpose for which each tract sold was held at the time of its sale, *Herzog Building Corp.,* 44 T.C. 694 (1965).

When the Statti tract was acquired it was expected that blocks 21-24, section 3, sold to Pitcock & Williams on December 6, 1967, would be subdivided into single-family homesites to be sold in the ordinary course of petitioner's business. There is no indication that petitioner altered its intention with respect to the disposition of this property prior to its being sold. Therefore, although this sale of this realty to Pitcock & Williams was not made within the ordinary course of petitioner's business, the gain recognized thereon is ordinary income. A contention raised by petitioner that this property falls within section 1231(b)(1) is wholly unfounded. See *Hollywood Baseball Assn. v. Commissioner,* 423 F.2d 494 (C.A. 9, 1970), affirming 42 T.C. 234 (1964).

On July 26, 1968, Beck's nominee, exercising an option granted on March 28, 1968, purchased the portions of section 3 which had been designated as blocks 25 and 26 in the preliminary plat. In acquiring the Statti tract, petitioner had intended that this acreage be subdivided into homesites for sale in the ordinary course of business. Gain recognized on its sale must therefore have been ordinary income unless petitioner's purpose in holding the property changed at some time prior to the transaction that culminated in its being sold. The burden of proving such a change

of purpose is on the petitioner, *Welch v. Helvering,* 290 U.S. 111 (1933). Petitioner has failed to carry that burden.

Petitioner has introduced some evidence tending to indicate that after the sale to Pitcock & Williams in December 1967, McMillan and Kachel began a reassessment of their plans for the development of section 3. As a consequence of this reassessment they proposed to construct several apartment house projects in the section for petitioner's own account. However, none of these projects was to be built on blocks 25 and 26. Indeed these two blocks were placed under option to Beck when plans for the apartment house projects were as yet in an incipient stage. There is no evidence that prior to their being sold, blocks 25 and 26 were held by petitioner for any purpose other than sale in the ordinary course of business. We therefore hold the gain recognized on the sale of blocks 25 and 26 to have been ordinary income.

We now direct our attention to the several sales of reserve acreage on which petitioner recognized gain in the years now before us.[18] For so long as it held the reserve acreage sold in these transactions, petitioner considered this land unsuitable for subdivision and sale as single-family dwelling sites by reason of its proximity to major thoroughfares. This being the case we hold that none of the reserve acreage sold in these transactions was at any time held by petitioner for sale in the ordinary course of its business. Consequently, gain recognized on the sales of reserve acreage was properly reported by petitioner as capital gain. See *Dunlap v. Oldham Lumber Co., supra* at 785; *Eline Realty Co.,* 35 T.C. 1 (1960); *Charles E. Mieg,* 32 T.C. 1314 (1959); *William B. Howell, supra* at 555.

### Issue 2. Additions to the Bad Debt Reserve

A reserve for bad debts is an approximation of the loss which the taxpayer can be expected to sustain on obligations owing to him at the close of his taxable year. *Ira Handelman,* 36 T.C. 560 (1961). If at the close of a taxable year the reserve appears inadequate to cover the portion of the taxpayer's accounts receivable which reasonably can be expected to prove worthless,

---

[18] We refer to the following sales: that of the northeast corner of sec. 2 on July 17, 1967; that of part of reserve D, sec. 3, on Dec. 6, 1967; that of reserve A, sec. 2, on Mar. 28, 1968; that of the southeast corner of sec. 3 on Apr. 1, 1968; and that of reserve C, sec. 2, on July 6, 1968.

the amount in the reserve ought to be increased. *Roanoke Vending Exchange, Inc.,* 40 T.C. 735 (1963). Section 166(c) provides:

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction * * * [for bad debt losses], there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

The second issue raised in this litigation concerns respondent's total disallowance of the deduction which petitioner claimed under section 166(c) for its fiscal year ended February 29, 1968, and his partial disallowance of the deduction which petitioner claimed under the same section for its succeeding fiscal year.

Section 1.166-4(b)(1), Income Tax Regs., provides:

(b) *Reasonableness of addition to reserve*—(1) *Relevant factors*—What constitutes a reasonable addition to a reserve for bad debts shall be determined *in the light of the facts existing at the close of the taxable year of the proposed addition.* The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. [Emphasis added.]

Should the Commissioner challenge the reasonableness of an addition made to a bad debt reserve, the taxpayer bears the burden of showing not only that the addition which he made was reasonable but that the Commissioner's adjustment constituted an abuse of discretion, *Roanoke Vending Exchange, Inc., supra; Merchants Industrial Bank v. Commissioner,* 475 F.2d 1063 (C.A. 10, 1973), affirming a Memorandum Opinion of this Court. Petitioner herein has carried this double burden.

In disallowing petitioner's deduction, respondent first averaged the amounts which were receivable by petitioner at the close of each of the first 4 years of its existence.[19] He then averaged the amounts which petitioner charged against the reserve over the same 4-year period. Finally he fixed the reserve which petitioner should have had at the end of the fourth year of its existence at the amount which bears the same ratio to the petitioner's accounts receivable at the end of that year as the latter of the aforesaid two averages bears to the former. To the extent the amount actually in the reserve at the end of the fourth year exceeded the amount fixed in the aforesaid manner, respondent

[19] The fourth year of petitioner's existence was its fiscal year ended Feb. 28, 1970.

disallowed the deductions claimed by petitioner under section 166(c), beginning with the first such deduction claimed.

In making his determination, respondent gave weight to events which occurred after the close of the years for which the deductions in issue were claimed. To do so was to contravene the regulation cited above and was therefore impermissible. When we eliminate petitioner's fourth fiscal year from consideration, it becomes manifest that what respondent has attempted in this case is to deny the petitioner section 166(c) deductions, despite circumstances indicating that some of petitioner's outstanding receivables would eventually prove uncollectable, merely because in petitioner's comparatively brief operational history it had not as yet actually sustained any bad debt losses. This we consider improper.[20]

The formula used by respondent will produce a satisfactory result where a relative consistency has emerged in the pattern of the taxpayer's bad debt losses. Reason compels us to conclude that petitioner's fiscal years ended February 29, 1968, and February 28, 1969, would prove a wholly unrepresentative period in the history of petitioner's bad debt losses; for petitioner's debtors were for the most part thinly capitalized corporations, the principal source of whose working capital was construction loans. Under the circumstances obtaining in this instance, we find respondent's attempt to apply the formula hereinabove described to have been wholly unwarranted and an abuse of discretion.

Furthermore, the additions which petitioner made to its bad debt reserves for the years now before us were not unreasonable in amount. For its fiscal year ended February 28, 1969, petitioner increased its bad debt reserve by an amount which approximated 14 percent of its accounts receivable. In so doing, petitioner acted upon the advice of a disinterested organization of competent professionals. We therefore hold this increase to have been reasonable. We must, therefore, also count as reasonable the more modest percentage of its accounts receivable which petitioner claimed as a deduction under section 166(c) for the fiscal year ended February 29, 1968.

While we cannot rest our holding with respect to this issue on petitioner's actual loss experience in years subsequent to these now before us, we can point to petitioner's subsequent loss experience as additional evidence tending to confirm our holding.

---

[20] *Glenn L. Bolling,* T.C. Memo. 1966-216, on remand from 357 F.2d 3 (C.A. 8, 1966).

See *Roanoke Vending Exchange, supra.* And our findings indicate that in the second triennium of its existence, unlike in the first, petitioner sustained substantial bad debt losses.

*Issue 3. The Sale of Land to the Spring Branch Independent School District*[21]

Finally we are asked to decide whether petitioner was entitled to defer the recognition of the gain realized on the sale of reserve D, section 2, to the Spring Branch Independent School District under section 1033(a)(3).

Generally, section 1033(a)(3) is applicable to sales of property under threat of condemnation if the property sold is replaced with property related to it in service or use.[22] Section 1033(g) provides that if the property sold was realty held for use in business or for investment, section 1033(a) will be deemed complied with if the replacement property is of like kind to the property sold and is held for either of the aforesaid purposes.

Reserve D, section 2, was acquired by petitioner for sale in the ordinary course of its business and held by it for that purpose until, fearing a condemnation proceeding, petitioner agreed to sell the property to the school district. The replacement property was thereafter acquired for sale in the ordinary course of business. It would then appear incontrovertible that section 1033(a)(3) would be available to petitioner in this instance; but respondent argues to the contrary.

On several occasions this Court has permitted capital gain treatment where property originally held for sale in the ordinary course of business was sold under a threat of condemnation. In each of these instances the Court found that the threat of condemnation caused the owner of the property to change his purpose in holding it, *Tri-S Corp.,* 48 T.C. 316 (1967), affd. 400 F.2d 862 (C.A. 10, 1968).[23] From these holdings respondent argues that at the time of its sale, reserve D, section 2, was held for investment; that therefore replacement property would have to comply with section 1033(g) if the relief provided for by section 1033(a)(3) were to be available; and that as the replace-

---

[21] In our opinion relating to issue 3, we shall refer to the tract sold to the school district by its designation on the plat recorded on July 15, 1968.

[22] Respondent concedes that reserve D, sec. 2, was sold under a threat of condemnation.

[23] *Juleo, Inc.,* T.C. Memo 1971-68, revd. 483 F. 2d 47 (C.A. 3, 1973), certiorari denied 414 U.S. 1103 (1973); *Ridgewood Land Co.,* T.C. Memo. 1972-16, affd. 477 F.2d 135 (C.A. 5, 1973).

ment property was in fact held for sale in the ordinary course of business, it did not satisfy the requirements of section 1033(g).

So to argue is to ignore the purpose for which section 1033(g) was adopted. Section 1033(g) was intended to broaden the definition of what constitutes property similar or related in service or use.[24]Respondent would have us apply section 1033(g) so as to deprive petitioner of the relief of section 1033(a)(3) under the very circumstances in which it was intended to be available. This we cannot do. We therefore hold that petitioner was entitled to elect section 1033(a)(3) with respect to the sale of reserve D, section 2, to the Spring Branch Independent School District.

*Decision will be entered under Rule 155.*

---

[24] See S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 993,994.