FAIRMONT HOMES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fairmont Homes, Inc. v. Commissioner
Docket No. 7804-79.
United States Tax Court
T.C. Memo 1983-209; 1983 Tax Ct. Memo LEXIS 577; 45 T.C.M. (CCH) 1340; T.C.M. (RIA) 83209; April 18, 1983. John L. Carey and Ernest J. Szarwark, for the petitioner. Robert D. Kaiser, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax as follows: Years Ending
Deficiency
June 30, 1975
$39,203.31
June 30, 1976
17,852.26
The issues for decision are: (1) whether petitioner is entitled to deduct payments made to a corporate officer during the taxable years ending June 30, 1975, and June 30, 1976, under section 162; *579 [1] (2) whether petitioner is entitled to deduct amounts paid during both taxable years for work done on its driveways and parking lots, or must capitalize such amounts under section 263; (3) whether petitioner may deduct amounts paid in connection with a business trip sponsored by petitioner for its employees and dealers or whether these deductions are disallowed under section 274; (4) whether petitioner is entitled to an addition to its bad debt reserve for taxable year ending June 30, 1975; and (5) whether petitioner is entitled to deduct any portion of amounts paid as reimbursed expenses during the taxable year ending June 30, 1975. Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioner, Fairmont Homes (Fairmont), is a corporation organized and operating under the laws of the State of Indiana. Its principal offices were located at Nappanee, Indiana, at the time its petition in this case was filed. Fairmont is an accrual-basis taxpayer with a fiscal year ending on June 30. It timely filed *580 Federal income tax returns for the fiscal year ending June 30, 1975, and the fiscal year ending June 30, 1976, with the office of the Internal Revenue Service in Memphis, Tennessee. Fairmont, since the date of its original incorporation and throughout the period in issue herein, has been a corporation involved in the manufactured housing industry. It is highly successful and does business in excess of $16 million a year. From the time of its organization until after March 30, 1976, one-half of the outstanding and issued voting stock of the petitioner was owned by James Shea (Jim) and the other half of its issued and outstanding voting stock was owned by John Shea (John). John and Jim are brothers and together with their sister Georgia comprised the original Board of Directors of petitioner. Both brothers had practiced law together prior to their organization and operation of Fairmont. John and Jim left their successful law practice to start a manufactured housing company with one of their former clients. The brothers built up the income and sales of this company over a period of several years. It then merged into a publicly traded corporation.The brothers received stock and *581 cash in the trade. After a brief hiatus, Jim and John decided to reenter the manufactured housing industry and established Fairmont Homes in 1971. Issue 1. Payments to John
Jim and John had a close working relationship prior to Fairmont's organization. Later, however, numerous events disrupted and eventually severed their close relationship. Fairmont attends two very important trade shows, one in South Bend, the other in Louisville. During January, 1972, while Jim worked hard to encourage the corporation's salesmen to sell as many manufactured housing units (units) as possible at the Louisville show, John urged the salesmen not to sell units because of the corporation's working capital difficulties. Their opinions were soon divided as to sources of financing, product specifications, production layout and labor management. As time progressed, John began making decisions concerning unit production without consulting Jim. This created product quality control difficulties and forced Jim to override John's John hired an engineer to control production and similar functions for the corporation. Jim received complaints from personnel about this engineer. He took these *582 complaints to John, who became upset by them. Eventually, the engineer's employment was terminated. Fairmont's original plant site was in Nappanee, Indiana. During 1973, the corporation established a second plant in Cambridge, Ohio. John took primary responsibility for operation of the Cambridge plant and in 1974, spent about half of his time there. Fiarmont began to have serious production problems with the number and quality of units produced by the Cambridge plant. These problems exacerbated the animosity which had developed between John and Jim. In September, 1974, Jim went to a trade show and discovered that the poor quality of products produced by the Cambridge plant had so ruined Fairmont's reputation that no dealers were interested in the product. Their banks threatened to cut off financing. So Fairmont management decided to close down the Cambridge plant. John went to Cambridge ostensibly to close down the plant, but instead, informed the workers that the plant would close only temporarily. Upon hearing this, Jim objected in writing and in December, 1974, personally went to Cambridge to close down the operations there. Jim and John also differed over such matters *583 as the "dragging" of accounts, inventory controls, timing of accounting data and the output of units to be produced by the Nappanee plant. The situation deteriorated to such a point that in November, 1974, Jim suggested that he and John give each other options to purchase one another's corporate stock. John responded by refusing, in a letter, either to sell his stock or to buy out his brother. He did agree, however, to limit his managerial participation to matters associated with his responsibilities as director and shareholder when his terms as president and treasurer expired on December 31, 1974. On February 10, 1975, John sent out an official letter stating his intention to limit his active participation in the management of Fairmont. Despite his letter of February 10, 1975, John continued to interfere in corporate operations to such an extent that Jim drafted a complaint seeking an injunction to keep John off the premises. Fairmont continued to pay John's salary during this period, although it did decrease the amount from $48,000 to $28,000. Fearing that litigation would severely damage Fairmont's financial situation, Jim attempted to work out a settlement whereby John *584 would continue as director of the Indiana Mobile Home Association on behalf of Fairmont and would continue to develop the overseas market for Fairmont. While the extent of his actual involvement in these activities is not clear, these "salary" payments were made to induce John to refrain from interfering in corporate business and to ward off a possible lawsuit over corporate control. It is these payments to John which are in issue. In June and September, 1975, John failed to attend corporate meetings and Jim began to fear that his actions on behalf of the corporation might be considered ultravires.
In May, 1975, John reexamined the earlier proposal made by Jim to give each of them the option to buy the other's Fairmont stock. At that time, John agreed to the cross-options proposal; John agreed either to sell his stock or to buy Jim's half. Fairmont held no corporate meetings until February 19, 1976, at which time Jim read into the minutes John's February 10, 1975, letter. Contrary to corporate counsel's advice, Jim decided to treat the year-old letter as a resignation. He felt that the danger of litigation by John had diminished. The purported vacancy created *585 by John was filled. John's "salary" was terminated. John submitted a proposal in March, 1976, to have Fairmont redeem his stock for $1.5 million. In May, after some negotiations involving a covenant not to compete, they signed the agreement. Respondent's primary argument is that the payments to John Shea were made in the process of acquiring a capital asset and, therefore, are not deductible as ordinary and necessary salary expenses. This issue was not raised in the Commissioner's statutory notice of deficiency. The statutory notice disallowed the deductions for compensation because they were "excessive" in amounts and "exceed[ed] a reasonable allowance for salary or other compensation for personal services actually rendered." For fiscal year ending June 30, 1975, of the $48,000 salary claimed as a deduction, $32,000 was in fact allowed. For the following fiscal year ending June 30, 1976, $28,000 was claimed, all of which was disallowed.
The burden of proof is generally on the petitioner because the Commissioner's determination in the statutory notice of deficiency is presumptively *586 correct. Welch v. Helvering,290 U.S. 111 (1933). This presumption applies, however, only to that which is contained in the statutory notice so that the burden of proof is on the respondent as to any new matter. Rule 142, Tax Court Rules of Practice and Procedure. A new matter is raised when the evidence required to prove an issue subsequently raised differs from the evidence required to prove the issue as stated in the notice of deficiency. Estate of Falese v. Commissioner,58 T.C. 895, 899 (1972); McCormick v. Commissioner,38 B.T.A. 308 (1938). Respondent did not raise the capital asset issue until trial. In the case before us a determination of whether payments are made in the process of acquiring a capital asset requires evidence different from that which addresses the issue of reasonableness of salary. Respondent, therefore, has raised a new matter with respect to its capital expenditure issue so that he bears the burden of proof thereon. We will now consider the issue on its merits. There is virtually no evidence in the record to support respondent's contention that the "salary" payments to John by petitioner were *587 made in connection with and resulted in the acquisition of John's Fairmont stock. Respondent concedes that when the cross-option idea was suggested, concrete terms and buy-out figures were discussed. None of these discussions ever included payments of "salary" as part of the deal. Furthermore, John's decision to treat Jim's February 10, 1975, letter as a resignation did not come until 1976 and was taken contrary to the advice of counsel. John, while agreeing to limit participation in management, was quite explicit about retaining his rights in the corporation. Respondent's assertion is that the sequence of events involving the option proposal, John's initial refusal and subsequent offer, negotiation, and sale is, on its face, related to the final sale price of $1.5 million.This argument is without support in the record before us. The evidence, in contrast, supports petitioner's view that the "salary" payments were section 162 trade or business expenses, as we will later elaborate. Accordingly, we find that respondent has failed to sustain his burden of proof with regard to this argument. Petitioner's main argument concerning the nature of these payments is that they are deductible *588 as ordinary and necessary business expenses because they were made to ward off litigation and to keep John from interfering in corporate affairs. The Commissioner in his statutory notice disallowed the deductions because they exceeded a reasonable allowance for salary or other compensation for personal services actually rendered. On brief respondent stated that in reality: "[W]hen all the payments, expectations and duties are viewed as a whole, the petitioner was paying John Shea to stay away from the plant and to keep him out of Jim Shea and the corporation's way and affairs." Respondent in its proposed findings of fact also stated that Jim continued the corporate checks to John "until the date he believed that the petitioner was financially able to weather any litigation by or against John Shea" and further that Jim "bought time" by permitting the payments to continue until petitioner was "in a position to decisively end the dispute." We agree with respondent's conclusion that petitioner was paying John to stay away, but we find this to be a proper business purpose for the payments. In The Catholic News Publishing Co. v. Commissioner,10 T.C. 73 (1948), a *589 corporation reimbursed its president for the expense of settling a dispute, between the president and a trade organization, which the corporation decided threatened the corporation's reputation and well being. In that case we defined the issue as "whether the expense incurred in settling a controversy injurious to petitioner's business and damaging to its reputation and standing can qualify as an ordinary and necessary business expense." 10 T.C. at 76. In answering the question in the affirmative, we stated that: We think other corporations would be impelled to make a similar outlay under similar circumstances * * *. As the payment in question was proximately related to the conduct of the petitioner's business, * * * and was made to protect and promote that business, * * * it is our opinion that it constitutes an ordinary and necessary business expense * * *. [Catholic News v. Commissioner, supra at 77.] We found no requirement, as respondent argues on brief, that the payments be made to an "external outside force." In the instant case, John's interference in corporate matters was seriously jeopardizing Fairmont's business and its reputation. *590 Furthermore, Jim was concerned that John would create additional problems through litigation. Payments to ward off the threat of litigation are deductible. Kornhauser v. United States,276 U.S. 145 (1928). Another reason for the payments to John was to induce him to refrain from participating in management as petitioner believed that much of its problems were caused by John's mismanagement. Payments made to induce a partner, shareholder or employee to take a course of action favorable to the payor-business are deductible. Aitkin v. Commissioner,12 B.T.A. 692 (1928). Petitioner entered into a compromise to restrain John from continuing his interference in corporate matters. We find the payments to John deductible in full under section 162(a) as ordinary and necessary business expenses. Issue 2. Costs for Driveways and Parking Lots
Fairmont's Nappanee plant is built on marshy terrain. The asphalt originally put down in 1971 for its driveways and parking lots began to sink and break up almost immediately. Depending upon usage, the initial asphalt *591 lasted from one to six years. During the taxable years in issue petitioner dug up certain areas of the driveways and filled cavities with new and improved materials. Concrete with reinforcing metal bars proved inadequate. Finally, petitioner found that crushed gravel, while it did break up, was possible to repair. Petitioner ultimately replaced all the asphalt-paved surfaces. It used progressively stronger materials to replace portions of the lots and driveways rather than simply resurfacing or filling holes and cracks in the asphalt. During its taxable year ending June 30, 1975, petitioner paid $27,193 for work done on its driveways and parking lots. For the taxable yeae ending June 30, 1976, it paid an additional $14,283.35 for similar work. Petitioner claimed these amounts as current deductions in these years. Petitioner also capitalized substantial portions of the expenditures with respect to similar work involving the parking lots. The Commissioner, in his statutory notice of deficiency disallowed petitioner's $41,476.35 of claimed deductions for repairs made to driveways and parking lots during the two taxable years in issue. *592 Petitioner has the burden on proving that the amounts expended were deductible expenses rather than capital expenditures. [2]Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 162 provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 1.162-4, Income Tax Regs., provides: The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, * * *. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an *593 account is kept. Section 263(a)(1) proscribes any deduction for (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * * Section 1.263(a)-(1)(a) and (b), Income Tax Regs., states that capital expenditures also include those that substantially prolong the useful life of the property or adapt the property to a new use. The distinction between a repair and a capital expenditure is often a fine one. In Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 338 (1962), this Court stated that the proper test is "whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." A much earlier case, Illinois Merchants Trust Co.,4 B.T.A. 103, 106 (1926), best captured the essence of the distinction by looking at the purpose for which the expenditure *594 was made. The Board focused on whether it was to repair or mend, as opposed to replace, which connotes a substitution. We have before us no evidence which sheds any light on the specific work done during the taxable years in issue. Petitioner has provided only one invoice for $4,725.24 specifically identifying the work performed. While substantial amounts were capitalized in connection with the paving, petitioner has failed to identify the difference between those items capitalized and those expensed. Petitioner's blanket characterization of the $41,476.35 as expenditures for repairs is insufficient to meet its burden of proof. We find, therefore, that petitioner has not shown its entitlement to the deductions under section 162. Issue 3. The Las Vegas Trip
Petitioner deducted on its Federal income tax return for fiscal year ending June 30, 1976, amounts paid in connection with a business trip it sponsored to Las Vegas for corporate employees, officers, mobile home dealers and their wives. Most of the wives were actively involved with their husbands in the mobile home business. Fairmont also determined that their presence would enhance the overall success of the trip *595 by aiding in the establishment of personal contracts between Fairmont and its dealers. In his statutory notice of deficiency, the Commissioner disallowed $11,096.16 for travel and entertainment expenses, explaining that it had not been adequately established that the $11,096.16 was "for an ordinary and necessary business expense or was expended for the purpose designated." Respondent, on brief, concedes that the expenses paid by the corporation for the husbands' attendance at Las Vegas meet the requirements of section 162. The focus, instead, is on the expenditures resulting from the presence of the wives on the business trip. Respondent cites section 1.162-2(c), Income Tax Regs., and analyzes the presence of the wives in the context of that regulation. Respondent is apparently confused about the applicable regulation. The issue is whether the corporation may deduct the expenses of the trip and not whether the husbands may deduct the wives' expenses. [3] Since petitioner's payments may also be viewed as additional compensation to its employees and as commissions paid to its dealers, respondent might have challenged these payments as unreasonable. He *596 has not done so. We find the amounts paid to be deductible by the corporation as additional compensation to to its employees and as commissions paid to its dealers under section 162(a)(1), see section 1.162-7(a), Income Tax Regs.
Issue 4. Addition to Bad Debt Reserve
Petitioner, Fairmont, is a corporation established in July, 1971. For its taxable year ending June 30, 1975, Fairmont added $38,598 to its bad debt reserve. In his statutory notice of deficiency, the Commissioner disallowed $25,000 of this increase, allowing $13,598 as a reasonable addition to the reserve. Petitioner elected the reserve method of deducting bad debts on its initial return and has used such method on all subsequent returns. For fiscal year ending June 30, 1975, petitioner used an independent, "big-eight" accounting firm which worked with petitioner's accounts receivable and computed the addition to the reserve. For its fiscal year ending June 30, 1975, Fairmont had accounts receivable exclusive of allowances for doubtful accounts of $826,798 and a bad debt reserve of $48,598. Fairmont's *597 gross sales for the years indicated were as follows: 6/30/72
6/30/73
6/30/74
6/30/75
6/30/76
$3,184,854
$10,681,055
$18,305,227
$16,709,879
$21,663,279
The computational method petitioner used to arrive at its addition to its bad debt reserve is shown by the workpapers of its accounting firm. Fairmont had its independent certified public accounting firm and its credit manager review each account and determine the likelihood of collectibility of each debt. They also included in their calculation accounts receivable past due over 90 days and those accounts with confirmation requests returned with no forwarding address. The taxable year in issue was in general a bad year for the mobile home industry. For reasons of quality control difficulties, Fairmont closed down its Cambridge, Ohio, plant. Petitioner also had some large outstanding loans. The issue is whether the Commissioner abused his discretion in disallowing part of petitioner's addition to its bad debt reserve for fiscal year ending June 30, 1975. Section 166(c) permits, at the discretion of the *598 Commissioner, a deduction for a reasonable addition to a reserve for bad debts in lieu of deducting specific debts which become worthless within the taxable year. A bad debt reserve is essentially an estimate of future losses which can reasonably be expected to result from debts outstanding at the close of the taxpayer year. Valmont Industries, Inc. v. Commissioner,73 T.C. 1059, 1067 (1980); Handelman v. Commissioner,36 T.C. 560 (1961). In determining what constitutes a reasonable addition, section 1.166-4(b)(1), Income Tax Regs., provides as follows: (1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as *599 those arising in prior taxable years, and the total amount of the existing reserve. [Emphasis added.] The Commissioner used the Black Motor formula to recompute petitioner's addition to its bad debt reserve. Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. on other grounds 125 F.2d 977 (6th Cir. 1942). The Black Motor formula is an arithmetic average of taxpayer's total receivables and bad debt losses during six previous years. The formula is an attempt to ascertain a "reasonable" addition to a bad debt reserve in light of the taxpayer's recent charge-off history and imposes an artificial limit on the size of the year-end reserve. The Black Motor formula has received considerable criticism during its 43-year life. The Supreme Court held that it will not disturb the Black Motor formula in Thor Power Tool Co. v. Commissioner,439 U.S. 522 (1979). But in Thor Power Tool Co.,supra, the Supreme *600 Court stated that there are situations in which the formula would generate an arbitrary result. If a taxpayer's most recent bad-debt experience is unrepresentative for some reason, a formula using that experience as data cannot be expected to produce a "reasonable" addition for the current year. [Thor Power Tool Co. v. Commissioner,supra at 549.] In Westchester Development Co. v. Commissioner,63 T.C. 198, 212 (1974), we held that the Commissioner had abused his discretion in applying the Black Motor formula where taxpayer's recent bad-debt experience was "wholly unrepresentative" in light of its "comparatively brief operational history." It is significant that in the Black Motor case, we noted: A method or formula that produces a reasonable addition to a bad debt reserve in one year, or a series of years, may be entirely out of tune with the circumstances of the year involved. [Black Motor Co. v. Commissioner,supra at 304.] Nowhere in the code or the regulations under section 166(c) is it stated that an addition to a bad debt reserve should generally be controlled by an arithmetic formula which *601 is purely retrospective in effect. Petitioner raises some cogent arguments against the Commissioner's adherence to it in virtually all factual situations. Because it unfairly presumes that the taxpayer has been in business long enough to have a meaningful experience factor and fails to give consideration to the effect of expansion into new areas or the state of the economy in the industry, petitioner argues its application is inappropriate. Petitioner's problem, however, is that the Commissioner's determination carries great weight because of the discretion vested in him under section 166(c). The burden placed on taxpayers under 166(c) is greater than that needed to overcome the presumption of correctness attaching to the ordinary notice of deficiency. A taxpayer must prove that his addition is reasonable and that the Commissioner's action in disallowing the addition was arbitrary and an abuse of discretion. Only where the taxpayer has shown the foregoing by persuasive evidence, may he use an alternative method to compute a larger additional to the reserve. For example, the circumstances *602 of a particular loan might justify a larger addition than the Black Motor formula would allow on the basis of past experience. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 550 n. 32 (1979). Petitioner added $38,598 to its bad debt reserve for fiscal year ending 1975. Fairmont's method of determining its bad debt reserve was to have its independent certified public accounting firm review each of its outstanding accounts receivable with Fairmont's credit manager to determine the likelihood of the collectibility of each debt. As primary support for its claim of reasonableness, petitioner introduced copies of workpapers of the accounting firm. This evidence was received for the sole purpose of showing the computational method used in arriving at the addition. Evidence of this kind, however, is not sufficient by itself to show that the amount so determined was proper. [4]
Petitioner did not call as witnesses the actual preparer of the documents, *603 any representative of the accounting firm or even the corporate employee who took part in the consideration of the accounts receivable. It is impossible to determine, therefore, whether specific accounts were doubtful or worthless or whether the addition is reasonable or supportable. This is particularly important in light of petitioner's own admission that during this same period it suffered a $1.6 million decrease in its sales volume. Valmont Industries Inc. v. Commissioner,73 T.C. 1059, 1069 (1980). Petitioner has not supported its general assertions with actual evidence. Petitioner further asserts that "[c]ircumstantial evidence provides strong support for the reasonableness of this determination," citing large outstanding loans and the fact that its bad debt reserve was a relatively small percentage of its total accounts receivable outstanding as of June 30, 1975. Petitioner also attempts by this to show that Commissioner's failure to consider such actions was an abuse of discretion. "[G]eneralizations as to the prevailing economic conditions and the opinions *604 of the petitioner's officers" are insufficient to meet taxpayer's burden of proving reasonableness of its method. Imperial Type Metal Co. v. Commissioner,106 F.2d 302, 304 (3d Cir. 1939), affg. a Memorandum Opinion of this Court. Nor did petitioner adequately show that unusual economic circumstances within the industry warranted consideration such that the Commissioner's failure to do so constituted an abuse of discretion. Accordingly, we find that petitioner has failed to meet its burden of proof under section 166(c). Issue 5. Travel and Entertainment Expenses
John Shea dividend his attention during fiscal year ending 1975 between the Nappanee, Indiana, plant and the Cambridge, Ohio, facilities. He spent approximately 50 percent of his time at Cambridge. This round trip was about 700 miles. The Cambridge plant temporarily closed in October, 1974, and permanently closed in December, 1974. Under Fairmont's reimbursement policy, he was entitled to reimbursement for these expenses upon providing sufficient substantiation to petitioner. Petitioner deducted $6,200 in reimbursed expenses for the taxable year in issue. Respondent disallowed the entire *605 amount.After a diligent search of its books and records petitioner was unable to locate the substantiating documentation. Section 274 was specifically enacted by Congress to abolish, in the area of travel and entertainment expenses, application of the Cohan rule which permitted an approximation of deductible travel and entertainment expenses where taxpayer has established all facts necessary to sustain the deduction except the exact amount of the item. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). For the taxable years at issue, section 274(d) provided: (d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating *606 his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. Petitioner admits it is unable to produce the required records and so has failed to meet its burden of substantiation under section 274. Respondent is sustained on this issue. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Hudlow v. Commissioner,T.C. Memo. 1971-218↩.
3. Bank of Stockton v. Commissioner,T.C. Memo. 1977-24↩.
4. Gold-Pak Meat Co., Inc. v. Commissioner,T.C. Memo. 1971-83; Imperial Type Metal Co. v. Commissioner,106 F.2d 302↩ (3d Cir. 1939), affg. a Memorandum Opinion of this Court.